## TWINING v. STATE OF NEW JERSEY.

### ERROR TO THE COURT OF ERRORS AND APPEALS OF THE STATE OF NEW JERSEY.

No. 10. Argued March 19, 20, 1908.—Decided November 9, 1908.

The judicial act of the highest court of a State in authoritatively construing and enforcing its laws is the act of the State.

Exemption from compulsory self-incrimination in the state courts is not secured by any part of the Federal Constitution.

There is a citizenship of the United States and a citizenship of the State which are distinct from each other, *Slaughter House Cases*, 16 Wall. 36; and privileges and immunities, although fundamental, which do not arise out of the nature and character of the National Government, or are not specifically protected by the Federal Constitution, are attributes of state, and not of National, citizenship.

The first eight Amendments are restrictive only of National action, and while the Fourteenth Amendment restrained and limited state action it did not take up and protect citizens of the States from action by the States as to all matters enumerated in the first eight Amendments.

The words "due process of law" as used in the Fourteenth Amendment are intended to secure the individual from the arbitrary exercise of powers of government unrestrained by the established principles of private right and distributive justice, *Bank* v. *Okely*, 4 Wheat. 235, but that does not require that he be exempted from compulsory self-incrimination in the courts of a State that has not adopted the policy of such exemption.

Exemption from compulsory self-incrimination did not form part of the " law of the land " prior to the separation of the colonies from the mother-country, nor is it one of the fundamental rights, immunities

and privileges of citizens of the United States, or an element of due process of law, within the meaning of the Federal Constitution or the Fourteenth Amendment thereto.

The fact that exemption from compulsory self-incrimination is specifically enumerated in the guarantees of the Fifth Amendment tends to show that it was, and is to be, regarded as a separate right and not as an element of due process of law.

When a question is no longer open in this court, adverse arguments, although weighty, will not be considered; and, under the doctrine of *stare decisis*, *Slaughter-House Cases*, 16 Wall. 36, and *Maxwell* v. *Dow*, 176 U. S. 581, approved and followed.

*Quære* and not decided whether an instruction that the jury may draw an unfavorable inference from the failure of the accused to testify in denial of evidence tending to criminate him amounts to a violation of the privilege of immunity from self-incrimination.

74 N. J. L. 683, affirmed.

ALBERT C. TWINING and David C. Cornell, the plaintiffs in error, hereafter called the defendants, were indicted by the grand jury of Monmouth County, in the State of New Jersey. The indictment charged that the defendants, being directors of the Monmouth Trust and Safe Deposit Company, knowingly exhibited a false paper to Larue Vreedenberg, an examiner of the State Banking Department, with intent to deceive him as to the condition of the company. Such an act is made a misdemeanor by a statute of the State (P. L. 1899, p. 450, at 461), which is as follows:

" Every director, officer, agent or clerk of any trust company who willfully and knowingly subscribes or makes any false statement of facts or false entries in the books of such trust company, or knowingly subscribes or exhibits any false paper, with intent to deceive any person authorized to examine as to the condition cf such trust company, or willfully or knowingly subscribes to or makes any false report, shall be guilty of a high misdemeanor and punished accordingly."

The defendants were found guilty on March 1, 1904, by the verdict of a jury, and judgment upon the verdict, that the defendants be imprisoned for six and four years respectively, was affirmed successively by the Supreme Court and the Court

of Errors and Appeals. There needs to be stated here only such part of what occurred at the trial as will describe the questions on which this court is authorized to pass. It appeared that in February, 1903, the company closed its doors. The bank examiner came at once to the place of business for the purpose of examining the affairs of the company, and found there Twining and Cornell, who were respectively president and treasurer as well as directors. Having soon discovered that according to a book entry there had been a recent payment of $44,875, for 381 shares of stock, the examiner inquired of the defendants by what authority this had been done, and was informed that it was done by authority of the board of directors, and the following paper was produced to him as a record of the transaction:

"Monmouth Trust & Safe Deposit Co., Asbury Park, N. J.

"A special meeting of the board of directors of this company was held at the office of the company on Monday, Feb. 9th, 1903. "There were present the following directors: George F. Kroehl, S. A. Patterson, G. B. M. Harvey, A. C. Twining, D. C. Cornell. "The minutes of the regular meeting held Jan. 15th, 1903, were read, and on motion duly approved.

"All loans taken since the last meeting were gone over carefully, and, upon motion duly seconded, were unanimously approved.

"A resolution that this company buy 381 shares of the stock of the First National Bank at $44,875 was adopted.

"On motion the meeting adjourned."

This was the paper referred to in the indictment, and it was incumbent on the prosecution to prove that it was false and that it was "knowingly" exhibited by the defendants to the examiner. There was evidence on the part of the prosecution tending to prove both these propositions. The defendants called no witnesses and did not testify themselves, although the law of New Jersey gave them the right to do so if they chose. In his charge to the jury the presiding judge said:

"Now, gentlemen, was this paper false? In the first place,

the paper charged in the indictment certifies in effect that a special meeting of the board of directors of this company was held at the office of the company on Monday, February 9, 1903. There were present the following directors: George F. Kroehl, S. A. Patterson, G. B. M. Harvey, A. C. Twining, D. C. Cornell.

"Among other things, appears a resolution of this company to buy 381 shares of the stock of the First National Bank at $44,875, which was adopted.

"Now, was that meeting held or not?

"That paper says that at this meeting were present, among others, Patterson, Twining and Cornell.

"Mr. Patterson has gone upon the stand and has testified that there was no such meeting to his knowledge; that he was not present at any such meeting; that he had no notice of any such meeting, and that he never acquiesced, as I understand, in any way in the passage of a resolution for the purchase of this stock.

"Now, Twining and Cornell, this paper says, were present. They are here in court and have seen this paper offered in evidence, and they know that this paper says that they were the two men, or two of the men, who were present. Neither of them has gone upon the stand to deny that they were present or to show that the meeting was held.

"Now, it is not necessary for these men to prove their innocence. It is not necessary for them to prove that this meeting was held. But the fact that they stay off the stand, having heard testimony which might be prejudicial to them, without availing themselves of the right to go upon the stand and contradict it, is sometimes a matter of significance.

"Now, of course, in this action, I do not see how that can have much weight, because these men deny that they exhibited the paper, and if one of these men exhibited the paper and the other did not, I do not see how you could say that the person who claims he did not exhibit the paper would be under any obligation at all to go upon the stand. Neither is under any

obligation. It is simply a right they have to go upon the stand, and, consequently the fact that they do not go upon the stand to contradict this statement in the minutes, they both denying, through their counsel and through their plea, that they exhibited the paper, I do not see that that can be taken as at all .prejudicial to either of them. They simply have the right to go upon the stand and they have not availed themselves of it, and it may be that there is no necessity for them to go there. I leave that entirely to you."

Further, in that part of the charge, relating to the exhibition of the paper to the examiner, the judge said:

"Now, gentlemen, if you believe that that is so; if you believe this testimony, that Cornell did direct this man's attention to it—Cornell has sat here and heard that testimony and not denied it—nobody could misunderstand the import of that testimony, it was a direct accusation made against him of his guilt—if you believe that testimony beyond a reasonable doubt, Cornell is guilty. And yet he has sat here and not gone upon the stand to deny it. He was not called upon to go upon the stand and deny it, but he did not go upon the stand and deny it, and it is for you to take that into consideration.

"Now Twining has also sat here and heard this testimony, but you will observe there is this distinction as to the conduct of these two men in this respect: the accusation against Cornell was specific by Vreedenberg. It is rather inferential, if at all, against Twining, and he might say—it is for you to say whether he might say, 'Well, I don't think the accusation against me is made with such a degree of certainty as to require me to deny it, and I shall not; nobody will think it strange if I do not go upon the stand to deny it, because Vreedenberg is uncertain as to whether I was there; he won't swear that I was there.' So consequently the fact that Twining did not go upon the stand can have no significance at all.

"You may say that the fact that Cornell did not go upon the stand has no significance. You may say so, because the circumstances may be such that there should be no inference

drawn of guilt or anything of that kind from the fact that he did not go upon the stand. Because a man does not go upon the stand you are not necessarily justified in drawing an inference of guilt. But you have a right to consider the fact that he does not go upon the stand where a direct accusation is made against him."

The question duly brought here by writ of error is, whether the parts of the charge set forth, affirmed as they were by the Court of last resort of the State, are in violation of the Fourteenth Amendment of the Constitution of the United States.

*Mr. John G. Johnson* and *Mr. Marshall Van Winkle*, with whom *Mr. William W. Gooch*, *Mr. Herbert C. Smyth* and *Mr. Frederic C. Scofield* were on the brief, for plaintiffs in error:

Comment by the court upon the failure of the accused to testify was a violation of the fundamental rights of the plaintiff in error and was a denial of due process of law as guaranteed by the Fourteenth Amendment.

In each case the primary inquiry must be as to what is the system of law of the particular State, and whether, according to that law, as adjudged by its courts, the procedure in question is "due process;" and the secondary inquiry must be whether in that process of law if followed, there is any violation of the fundamental rights secured by the Federal Constitution. Guthrie's Fourteenth Amendment, p. 72, citing *Kennard* v. *Louisiana*, 92 U. S. 480, 481; *Caldwell* v. *Texas*, 137 U. S. 692, 698; *Leeper* v. *Texas*, 139 U. S. 462, 469; *McNulty* v. *California*, 149 U. S. 645, 647.

When a statute, harmless on its face, is systematically enforced in violation of fundamental rights, the procedure is not due process of law, and may be declared void and set aside by the courts under the jurisdiction conferred by the Fourteenth Amendment. Guthrie, p. 73, and cases cited.

The State of New Jersey alone permits comment upon the failure of the accused to testify, and bases its action solely upon the absence of any restriction in the qualifying statute,

holding that the accused is thus placed in the same position as any party to a civil suit. *Parker* v. *State*, 61 N. J. L. 308; *State* v. *Wines*, 65 N. J. L. 31; *State* v. *Banusik*, 64 Atl. Rep. 994.

In this connection the decisions of courts of States in the same class with New Jersey (as to statutory provisions on this subject) should be considered. See, therefore, *People* v. *Tyler*, 36 California, 522; *Price* v. *Commonwealth*, 77 Virginia (Ct. of App.), 393; *State* v. *Howard*, 35 S. Car. 202; *Bird* v. *Georgia*, 50 Georgia, 585, 589.

See also, for statutes and decisions of the several States on this subject, Wigmore on Evidence, Vol. 3, § 2272, n. 2, and Vol. 1, § 488. Other cases are: *Wilson* v. *United States*, 149 U. S. 60; *McKnight* v. *United States*, 115 Fed. Rep. 982, 983; *Cooper* v. *State*, 86 Alabama, 610; *People* v. *Cuff*, 122 California, 589; *People* v. *Brown*, 53 California, 66; *People* v. *Streuber*, 121 California, 43; *Quinn* v. *People*, 123 Illinois, 345; *Baker* v. *People*, 105 Illinois, 452; *Austin* v. *People*, 102 Illinois, 261; *Angelo* v. *People*, 96 Illinois, 209; *Miller* v. *People*, 216 Illinois, 309; *Wynehamer* v. *People*, 13 N. Y. 444, 447; *Ruloff* v. *People*, 45 N. Y. 213, 225; *People* v. *Courtney*, 94 N. Y. 492.

Comment by the court upon the failure of the accused to testify was a denial to the plaintiff in error of his privilege and immunity as a citizen of the United States guaranteed by the Fourteenth Amendment, in that he was thus compelled to be a witness against himself in violation of the Fifth Amendment.

Whether or not the Fourteenth Amendment has extended the application of the principle of the Fifth Amendment to the several States is still an open question undecided by this court. *Davidson* v. *New Orleans*, 96 U. S. 104; *The Slaughter-House Cases*, 16 Wall. 36; *Barrington* v. *Missouri*, 205 U. S. 486.

The power of the States to abridge these great rights of citizens can never be conceded until the court shall expressly

so decide in a case involving the exact question, and adequately argued. Guthrie, p. 62.

That this privilege is a fundamental right is shown by the history of the provision contained in the Fifth Amendment. *Bram* v. *United States*, 168 U. S. 543 *et seq.;* 1 Stephen's History of the Criminal Law of England, 440; Story on the Constitution (5th ed.), 1782 and 1788; 2 Story's Commentaries on the Constitution (5th ed.), 697; Cooley's Const. Lim. (6th ed.), 375; *Counselman* v. *Hitchcock*, 142 U. S. 563. See *Boyd* v. *United States*, 116 U. S. 616, holding unconstitutional a statute making the failure of a witness to attend and produce evidence against himself, a confession of guilt.

Here a failure to take the stand is made an admission of guilt.

The compulsion prohibited by the Fifth Amendment is not alone physical or mental duress. *United States* v. *Bell*, 81 Fed. Rep. 837.

No statute, rule or regulation, or act of administration in the given case, can be constitutional, which does not in some way protect the right to be silent if the citizen chooses to be silent. *United States* v. *Bell, supra.*

And as to requiring production of documents which would have been self-incriminating, see *McKnight* v. *United States*, 115 Fed. Rep. 981.

When a State violates a fundamental right of a citizen of the United States, this court will interfere; and the laws of a State come under the prohibition of the Fourteenth Amendment when they infringe fundamental rights. *Ballard* v. *Hunter*, 204 U. S. 262.

The State has full control over the procedure in its courts, both in civil and criminal cases, subject only to the qualification that such procedure must not work a denial of fundamental rights or conflict with specific and applicable provisions of the Federal Constitution. *Brown* v. *New Jersey*, 175 U. S. 175; *West* v. *Louisiana*, 194 U. S. 263; *Rogers* v. *Peck*, 199 U. S. 425; *Gibson* v. *Mississippi*, 162 U. S. 563.

Due process implies, at least, conformity to natural and inherent principles of justice. *Holden* v. *Hardy,* 169 U. S. 366.

In the Fourteenth Amendment, by parity of reasoning, it refers to that law of the land, in each State, which derives its authority from the inherent and reserved powers of the State, exercised within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws and alter them at their pleasure. *Hurtado* v. *California,* 110 U. S. 516. The purpose of that Amendment is to extend to the citizens and residents of the States the same protection against arbitrary state legislation affecting life, liberty and property as is afforded by the Fifth Amendment against similar legislation by Congress. *Tonawanda* v. *Lyon,* 181 U. S. 392; Guthrie, 2, 3; *Holden* v. *Hardy,* 169 U. S. 366, 389; *O'Neil* v. *Vermont,* 144 U. S. 323, 370.

*Mr. Robert H. McCarter,* Attorney General of the State of New Jersey, and *Mr. H. M. Nevius,* with whom *Mr. Nelson B. Gaskill* was on the brief, for defendant in error:

If the court shall be of the opinion that the charge of the trial court had the effect of violating the privilege against compulsory self-crimination, we answer to the first assignment that it discloses no fundamental right or immunity guaranteed to the plaintiffs in error as citizens of the United States by the Fourteenth Amendment which has been abridged by the decision of the court of last resort of New Jersey.

While it is unquestionably true that there has always been in existence in this country a general government over and among the States, the sole rights secured by constitutional provision prior to the formation of the present Federal Government were those of the citizens of the several States. In these several constitutions, as in that of New Jersey, the inhabitants of each State declared the limitations which were

deemed essential to the protection and preservation of their cherished rights. The powers of the States differ in this respect from the powers of the general government, because, representing the people of the State, each state government exercises those powers against which it is not restrained by the limitations of the state constitution; while the general government, being a government of delegated powers, exercises only those powers which are contained in the provisions of the Federal Constitution. In the rights and restrictions under the state constitutions, therefore, rest the rights of the citizens of the States as such.

When a Federal Government was later formed, a Federal citizenship first came into being, not dependent upon the state constitutions, and not equipped with common-law rights, but dependent upon the essential requisites and provisions of the instrument, the Federal Constitution, which called it into being. The rights of a citizen of the United States may be those of a citizen of any of the States by virtue of the two citizenships existing conjointly in any one person, but they are not necessarily coincident; and the rights of a citizen of the United States are not necessarily those of a citizen of any of the individual States.

The duty of protection to a citizen of a State in his privileges and immunities is not by the Fourteenth Amendment devolved upon the general government, but remains with the State itself where it naturally and properly belongs. Story on the Constitution (5th ed.), par. 1936. See also *Kemmler* v. *United States*, 136 U. S. 448; *Duncan* v. *Missouri*, 152 U. S. 382; *Wadleigh* v. *Newhall*, 136 Fed. Rep. 946.

There is in the Federal Constitution, the source of the rights and immunities of the plaintiffs in error as citizens of the United States, no guarantee of a privilege against compulsory self-crimination which is binding upon the courts of New Jersey, or the abridgment of which by the state courts would give corrective jurisdiction in the Federal Supreme Court.

The only basis for a contrary claim is found in the Fifth

Amendment which, however, is binding only on the Federal
Government and its agencies, and is not a limitation upon any
of the States. The rights or immunities which it creates,
therefore, are rights and immunities against Federal, but not
against state interference or abridgment. See *Barron* v.
*Baltimore,* 7 Pet. 243, which was reviewed and followed in
*Twitchell* v. *The Commonwealth,* 7 Wall. 321; *Walker* v. *Sauvi-
net,* 92 U. S. 90; *Hallinger* v. *Davis,* 146 U. S. 314; *Holden* v.
*Hardy,* 169 U. S. 366; *Munn* v. *Illinois,* 94 U. S. 113; *Kelly*
v. *Pittsburg,* 104 U. S. 78; *Nashville* v. *Alabama,* 128 U. S. 96;
*Davis* v. *Texas,* 139 U. S. 651.

As plaintiffs in error make no claim to this court as citizens
of New Jersey, whatever rights and immunities have been
abridged are not a matter of concern to this court unless they
can be shown to have had their origin in the Constitution
of the United States, or its Amendments, or the necessary
requisites thereof. The only right against compulsory self-
crimination guaranteed to citizens of the United States is a
right and immunity operative in Federal courts, or in any
sphere of Federal influence, but there is no such right guar-
anteed as such to citizens of the United States by the Con-
stitution of the United States or its Amendments, which the
State of New Jersey is obliged to consider.

If it be true that the Fourteenth Amendment added to the
civil rights of citizens of the United States, the civil rights
peculiar to the other citizens of any State in which they might
choose to reside, and so far abolished the distinction between
citizenship of a State and of the United States, then it is only
necessary to inquire into the status of the rights and im-
munities with reference to the privilege against self-crimination
enjoyed by the citizens of the State of New Jersey at the time
of the promulgation of the Fourteenth Amendment.

This Amendment created no new civil rights. It merely
extended the operation of existing rights, and furnished addi-
tional protection to such rights. *Barbier* v. *Connolly,* 113 U. S.
27; *United States* v. *Sanges,* 48 Fed. Rep. 78; *Minor* v. *Hap-*

*persett,* 21 Wall. 171; *United States* v. *Cruikshank,* 92 U. S. 542.

If, therefore, there was added to the civil rights and immunities guaranteed to the plaintiffs in error as citizens of the United States, any additional immunities or rights by virtue of the Fourteenth Amendment, the addition comprises only those rights and immunities which were common to all other citizens of New Jersey in July, 1868, when the Amendment went into effect. And citizens of the United States, resident in New Jersey, could have had at that time no greater rights or immunities than the other citizens of New Jersey enjoyed.

To a citizen of the United States there was at the time of the adoption of the Fourteenth Amendment, no guaranteed privilege or immunity with reference to an alleged error complained of which the courts of New Jersey were bound to recognize, and in the courts of New Jersey as to all persons under their jurisdiction, there was no right or immunity against the submission by a trial court to a jury of the question and matter submitted in this case.

The courts of New Jersey had established at that time the principle of privilege against self-crimination, and had also established as a parallel and not as a contradictory principle, that the question of inference to be raised by the failure to deny a direct criminal accusation when opportunity offered, might properly be submitted to a jury. Plaintiffs in error cannot show the existence of any fundamental right or immunity against compulsory self-crimination, guaranteed by the Fourteenth Amendment, which has been abridged by the courts of New Jersey, as alleged by the pleader in his first assignment of error. On the contrary, the charge in this case was in accordance with the legal recognition of the right of self-crimination as that right existed in New Jersey from the very beginning, and which has not been altered or attempted to be altered since the passage and adoption of the Fourteenth Amendment.

Plaintiffs in error have no just complaint on the basis of any want of due process of law. The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. Each State prescribes its own modes of judicial proceedings. *Hallinger* v. *Davis*, 146 U. S. 321, citing *Missouri* v. *Lewis*, 101 U. S. 51, and see also *Holden* v. *Hardy*, 169 U. S. 366, 389; *Hurtado* v. *California*, 110 U. S. 535; *Walker* v. *Sauvinet*, 92 U. S. 92.

The Fourteenth Amendment legitimately operates to extend to the citizens and residents of the States the same protection against arbitrary state legislation affecting life, liberty and property, as is offered by the Fifth Amendment against similar legislation by Congress. But the Federal courts ought not to interfere when what is complained of amounts to the enforcement of the laws of a State applicable to all persons in like circumstances and conditions, and the Federal courts should not interfere unless there is some abuse of law amounting to confiscation of property or deprivation of personal rights. 9 Fed. Stat. Ann., 427.

MR. JUSTICE MOODY, after making the foregoing statement, delivered the opinion of the court.

In the view we take of the case we do not deem it necessary to consider whether, with respect to the Federal question, there is any difference in the situation of the two defendants. It is assumed, in respect of each, that the jury were instructed that they might draw an unfavorable inference against him from his failure to testify, where it was within his power, in denial of the evidence which tended to incriminate him. The law of the State, as declared in the case at bar, which accords with other decisions (*Parker* v. *State*, 61 N. J. L. 308; *State* v. *Wines*, 65 N. J. L. 31; *State* v. *Zdanowicz*, 69 N. J. L. 619; *State* v. *Banuski*, 64 Atl. Rep. 994), permitted such an inference to be drawn. The judicial act of the highest court of the

State, in authoritatively construing and enforcing its laws, is the act of the State. *Ex parte Virginia,* 100 U. S. 339; *Scott v. McNeal,* 154 U. S. 34; *Chicago, Burlington & Quincy Railroad Company* v. *Chicago,* 166 U. S. 226. The general question, therefore, is, whether such a law violates the Fourteenth Amendment, either by abridging the privileges or immunities of citizens of the United States, or by depriving persons of their life, liberty or property without due process of law. In order to bring themselves within the protection of the Constitution it is incumbent on the defendants to 'prove two propositions: first, that the exemption from compulsory self-incrimination is guaranteed by the Federal Constitution against impairment by the States; and, second, if it be so guaranteed, that the exemption was in fact impaired in the case at bar. The first proposition naturally presents itself for earlier consideration. If the right here asserted is not a Federal right, that is the end of the case. We have no authority to go further and determine whether the state court has erred in the interpretation and enforcement of its own laws.

The exemption from testimonial compulsion, that is, from disclosure as a witness of evidence against oneself, forced by any form of legal process, is universal in American law, though there may be differences as to its exact scope and limits. At the time of the formation of the Union the principle that no person could be compelled to be a witness against himself had become embodied in the common law and distinguished it from all other systems of jurisprudence. It was generally regarded then, as now, as a privilege of great value, a protection to the innocent though a shelter to the guilty, and a safeguard against heedless, unfounded or tyrannical prosecutions. Five of the original thirteen States (North Carolina, 1776; Pennsylvania, 1776; Virginia, 1776; Massachusetts, 1780; New Hampshire, 1784) had then guarded the principle from legislative or judicial change by including it in constitutions or bills of rights; Maryland had provided in her constitution (1776) that "no man ought to be compelled to give evidence against

himself, in a common court of law, or in any other court, but
in such cases as have been usually practiced in this State or
may hereafter be directed by the legislature;" and in the re-
mainder of those States there seems to be no doubt that it was
recognized by the courts. The privilege was not included in
the Federal Constitution as originally adopted, but was placed
in one of the ten Amendments which were recommended to the
States by the first Congress, and by them adopted. Since then
all the States of the Union have, from time to time, with vary-
ing form but uniform meaning, included the privilege in their
constitutions, except the States of New Jersey and Iowa, and
in those States it is held to be part of the existing law. *State* v.
*Zdanowicz, supra; State* v. *Height,* 117 Iowa, 650. It is obvious
from this short statement that it has been supposed by the
States that, so far as the state courts are concerned, the priv-
ilege had its origin in the constitutions and laws of the States, .
and that persons appealing to it must look to the State for their
protection. Indeed, since by the unvarying decisions of this
court the first ten Amendments of the Federal Constitution
are restrictive only of National action, there was nowhere else
to look up to the time of the adoption of the Fourteenth
Amendment, and the State, at least until then, might give,
modify or withhold the privilege at its will. The Fourteenth
Amendment withdrew from the States powers theretofore
enjoyed by them to an extent not yet fully ascertained, or
rather, to speak more accurately, limited those powers and
restrained their exercise. There is no doubt of the duty of this
court to enforce the limitations and restraints whenever they
exist, and there has been no hesitation in the performance of
the duty. But whenever a new limitation or restriction is de-
clared it is a matter of grave import, since, to that extent, it
diminishes the authority of the State, so necessary to the per-
petuity of our dual form of government, and changes its rela-
tion to its people and to the Union. The question in the case
at bar has been twice before us, and been left undecided, as
the cases were disposed of on other grounds. *Adams* v. *New*

*York,* 192 U. S. 585; *Consolidated Rendering Co.* v. *Vermont,* 207 U. S. 541. The defendants contend, in the first place, that the exemption from self-incrimination is one of the privileges and immunities of citizens of the United States which the Fourteenth Amendment forbids the States to abridge. It is not argued that the defendants are protected by that part of the Fifth Amendment which provides that "no person . . . shall be compelled in any criminal case to be a witness against himself;" for it is recognized by counsel that by a long line of decisions the first ten Amendments are not operative on the States. *Barron* v. *Baltimore,* 7 Pet. 243; *Spies* v. *Illinois,* 123 U. S. 131; *Brown* v. *New Jersey,* 175 U. S. 172; *Barrington* v. *Missouri,* 205 U. S. 483. But it is argued that this privilege is one of the fundamental rights of National citizenship, placed under National protection by the Fourteenth Amendment, and it is specifically argued that the "privileges and immunities of citizens of the United States," protected against state action by that Amendment, include those fundamental personal rights which were protected against National action by the first eight Amendments; that this was the intention of the framers of the Fourteenth Amendment, and that this part of it would otherwise have little or no meaning and effect. These arguments are not new to this court and the answer to them is found in its decisions. The meaning of the phrase "privileges and immunities of citizens of the United States," as used in the Fourteenth Amendment, came under early consideration in the *Slaughter-House Cases,* 16 Wall. 36. A statute of Louisiana created a corporation and conferred upon it the exclusive privilege, for a term of years, of establishing and maintaining within a fixed division of the city of New Orleans stock-yards and slaughter-houses. The act provided that others might use these facilities for a prescribed price, forbade the landing for slaughter or the slaughtering of animals elsewhere or otherwise, and established a system of inspection. Those persons who were driven out of independent business by this law denied its validity in suits which came to this

court by writs of error to the Supreme Court of the State which had sustained the act. It was argued, *inter alia*, that the statute abridged the privileges and immunities of the plaintiffs in error as citizens of the United States, and the particular privilege which was alleged to be violated was that of pursuing freely their chosen trade, business or calling. The majority of the court were not content with expressing the opinion that the act did not in fact deprive the plaintiffs in error of their right to exercise their trade (a proposition vigorously disputed by four dissenting justices), which would have disposed of the case, but preferred to rest the decision upon the broad ground that the right asserted in the case was not a privilege or immunity belonging to persons by virtue of their National citizenship, but, if existing at all, belonging to them only by virtue of their state citizenship. The Fourteenth Amendment, it is observed by Mr. Justice Miller, delivering the opinion of the court, removed the doubt whether there could be a citizenship of the United States independent of citizenship of the State, by recognizing or creating and defining the former. "It is quite clear, then," he proceeds to say (p. 74), " that there is a citizenship of the United States and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual." The description of the privileges and immunities of state citizenship, given by Mr. Justice Washington in *Corfield* v. *Coryell*, 4 Wash. C. C. 371, is then quoted, approved and (p. 76) said to include "those rights which are fundamental," to embrace "nearly every civil right for the establishment and protection of which organized government is instituted," and "to be the class of rights which the state governments were created to establish and secure." This part of the opinion then concludes with the holding that the rights relied upon in the case are those which belong to the citizens of States as such and are under the sole care and protection of the state governments. The conclusion is preceded by the important declaration that the civil rights theretofore appertaining to citizenship of the States

and under the protection of the States, were not given the security of National protection by this clause of the Fourteenth Amendment. The exact scope and the momentous consequence of this decision are brought into clear light by the dissenting opinions. The view of Mr. Justice Field, concurred in by Chief Justice Chase and Justices Swayne and Bradley, was that the fundamental rights of citizenship, which by the opinion of the court were held to be rights of state citizenship, protected only by the state government, became, as the result of the Fourteenth Amendment, rights of National citizenship protected by the National Constitution. Said Mr. Justice Field (p. 95):

"The fundamental rights, privileges and immunities which belong to him as a free man and a free citizen, now belong to him as a citizen of the United States, and are not dependent upon his citizenship of any State. . . . The Amendment does not attempt to confer any new privileges or immunities upon citizens, or to enumerate or define those already existing. It assumes that there are such privileges and immunities which belong of right to citizens as such, and ordains that they shall not be abridged by state legislation. If this inhibition has no reference to privileges and immunities of this character, but only refers, as held by the majority of the court in their opinion, to such privileges and immunities as were before its adoption specially designated in the Constitution or necessarily implied as belonging to citizens of the United States, it was a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage. With privileges and immunities thus designated or implied no State could ever have interfered by its laws, and no new constitutional provision was required to inhibit such interference. The supremacy of the Constitution and laws of the United States always controlled any state legislation of that character. But if the Amendment refers to the natural and inalienable rights which belong to all citizens, the inhibition has a profound significance and consequence."

In accordance with these principles it is said by the learned justice that the privileges and immunities of state citizenship described by Mr. Justice Washington, and held by the majority of the court still to pertain exclusively to state citizenship and to be protected solely by the state government, have been guaranteed by the Fourteenth Amendment as privileges and immunities of citizens of the United States. And see the concurring opinions of Mr. Justice Field and Mr. Justice Bradley in *Bartemeyer* v. *Iowa*, 18 Wall. 129, and in *Butchers' Union Company* v. *Crescent City Company*, 111 U. S. 746. There can be no doubt, so far as the decision in the *Slaughter-House Cases* has determined the question, that the civil rights sometimes described as fundamental and inalienable, which before the war Amendments were enjoyed by state citizenship and protected by state government, were left untouched by this clause of the Fourteenth Amendment. Criticism of this case has never entirely ceased, nor has it ever received universal assent by members of this court. Undoubtedly, it gave much less effect to the Fourteenth Amendment than some of the public men active in framing it intended, and disappointed many others. On the other hand, if the views of the minority had prevailed it is easy to see how far the authority and independence of the States would have been diminished, by subjecting all their legislative and judicial acts to correction by the legislative and review by the judicial branch of the National Government. But we need not now inquire into the merits of the original dispute. This part at least of the *Slaughter-House Cases* has been steadily adhered to by this court, so that it was said of it, in a case where the same clause of the Amendment was under consideration (*Maxwell* v. *Dow*, 176 U. S. 581, 591), "The opinion upon the matters actually involved and maintained by the judgment in the case has never been doubted or overruled by any judgment of this court." The distinction between National and state citizenship and their respective privileges there drawn has come to be firmly established. And so it was held that the right of peaceable assem-

bly for a lawful purpose (it not appearing that the purpose had any reference to the National Government) was not a right secured by the Constitution of the United States, although it was said that the right existed before the adoption of the Constitution of the United States, and that "it is and always has been one of the attributes of citizenship under a free government." *United States* v. *Cruikshank,* 92 U. S. 542, 551. And see *Hodges* v. *United States,* 203 U. S. 1. In each case the *Slaughter-House Cases* were cited by the court, and in the latter case the rights described by Mr. Justice Washington were again treated as rights of state citizenship under state protection. If then it be assumed, without deciding the point, that an exemption from compulsory self-incrimination is what is described as a fundamental right belonging to all who live under a free government, and incapable of impairment by legislation or judicial decision, it is, so far as the States are concerned, a fundamental right inherent in state citizenship, and is a privilege or immunity of that citizenship only. Privileges and immunities of citizens of the United States, on the other hand, are only such as arise out of the nature and essential character of the National Government, or are specifically granted or secured to all citizens or persons by the Constitution of the United States. *Slaughter-House Cases, supra,* p. 79; *In re Kemmler,* 136 U. S. 436, 448; *Duncan* v. *Missouri,* 152 U. S. 377, 382.

Thus among the rights and privileges of National citizenship recognized by this court are the right to pass freely from State to State, *Crandall* v. *Nevada,* 6 Wall. 35; the right to petition Congress for a redress of grievances, *United States* v. *Cruikshank, supra;* the right to vote for National officers, *Ex parte Yarbrough,* 110 U. S. 651; *Wiley* v. *Sinkler,* 179 U. S. 58; the right to enter the public lands, *United States* v. *Waddell,* 112 U. S. 76; the right to be protected against violence while in the lawful custody of a United States marshal, *Logan* v. *United States,* 144 U. S. 263; and the right to inform the United States authorities of violation of its laws, *In re Quarles,* 158 U. S. 532.

VOL. CCXI—7

Most of these cases were indictments against individuals for conspiracies to deprive persons of rights secured by the Constitution of the United States, and met with a different fate in this court from the indictments in *United States* v. *Cruikshank* and *Hodges* v. *United States*, because the rights in the latter cases were rights of state and not of National citizenship.· But assuming it to be true that the exemption from self-incrimination is not, as a fundamental right of National citizenship, included in the privileges and immunities of citizens of the United States, counsel insist that, as a right specifically granted or secured by the Federal Constitution, it is included in them. This·view is based upon the contention which must now be examined, that the safeguards of personal rights which are enumerated in the first eight Articles of amendment to the Federal Constitution, sometimes called the Federal Bill of Rights, though they were by those Amendments originally secured only against National action, are among the privileges and immunities of citizens of the United States, which this clause of the Fourteenth Amendment protects against state action. This view has been, at different times, expressed by justices of this court (Mr. Justice Field in *O'Niel* v. *Vermont*, ·144 U. S. 323, 361; Mr. Justice Harlan in the same case, 370, and in *Maxwell* v. *Dow*, 176 U. S. 606, 617), and was undoubtedly that entertained by some of those who framed the Amendment. It is, however, not profitable to examine the weighty arguments in its favor, for the question is no longer open in this court. The right of trial by jury in civil cases, guaranteed by the Seventh Amendment (*Walker* v. *Sauvinet*, ·92 U. S. 90), and the right to bear arms guaranteed by the Second Amendment (*Presser* v. *Illinois*, 116 U. S. 252), have been distinctly held not to be privileges and immunities of citizens of the United States guaranteed by the Fourteenth Amendment against abridgment by the States, and in effect the same decision was made in respect of the guarantee against prosecution, except by indictment of a grand jury, contained in the Fifth Amendment (*Hurtado* v. *California*, 110 U. S. 516),

and in respect of the right to be confronted with witnesses, contained in the Sixth Amendment. *West* v. *Louisiana*, 194 U. S. 258. In *Maxwell* v. *Dow, supra,* where the plaintiff in error had been convicted in a state court of a felony upon an information, and by a jury of eight persons, it was held that the indictment, made indispensable by the Fifth Amendment, and the trial by jury guaranteed by the Sixth Amendment, were not privileges and immunities of citizens of the United States, as those words were used in the Fourteenth Amendment. The discussion in that case ought not to be repeated. All the arguments for the other view were considered and answered, the authorities were examined and analyzed, and the decision rested upon the ground that this clause of the Fourteenth Amendment did not forbid the States to abridge the personal rights enumerated in the first eight Amendments, because those rights were not within the meaning of the clause "privileges and immunities of citizens of the United States." If it be possible to render the principle which governed the decision more clear, it is done so by the dissent of Mr. Justice Harlan. We conclude, therefore, that the exemption from compulsory self-incrimination is not a privilege or immunity of National citizenship guaranteed by this clause of the Fourteenth Amendment against abridgment by the States.

The defendants, however, do not stop here. They appeal to another clause of the Fourteenth Amendment, and insist that the self-incrimination, which they allege the instruction to the jury compelled, was a denial of due process of law. This contention requires separate consideration, for it is possible that some of the personal rights safeguarded by the first eight Amendments against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. *Chicago, Burlington & Quincy Railroad* v. *Chicago*, 166 U. S. 226. If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law. Few

phrases of the law are so elusive of exact apprehension as this. Doubtless the difficulties of ascertaining its connotation have been increased in American jurisprudence, where it has been embodied in constitutions and put to new uses as a limit on legislative power. This court has always declined to give a comprehensive definition of it, and has preferred that its full meaning should be gradually ascertained by the process of inclusion and exclusion in the course of the decisions of cases as they arise. There are certain general principles well settled, however, which narrow the field of discussion and may serve as helps to correct conclusions. These principles grow out of the proposition universally accepted by American courts on the authority of Coke, that the words "due process of law" are equivalent in meaning to the words "law of the land," contained in that chapter of Magna Carta, which provides that "no freeman shall be taken, or imprisoned, or disseised, or outlawed, or exiled, or any wise destroyed; nor shall we go upon him, nor send upon him, but by the lawful judgment of his peers or by the law of the land." *Murray* v. *Hoboken Land Co.,* 18 How. 272; *Davidson* v. *New Orleans,* 96 U. S. 97; *Jones* v. *Robbins,* 8 Gray, 329; Cooley, Const. Lim. (7th ed.), 500; McGehee, Due Process of Law, 16. From the consideration of the meaning of the words in the light of their historical origin this court has drawn the following conclusions:

First. What is due process of law may be ascertained by an examination of those settled usages and modes of proceedings existing in the common and statute law of England before the emigration of our ancestors, and shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country. This test was adopted by the court, speaking through Mr. Justice Curtis, in *Murray* v. *Hoboken Land Co.,* 18 How. 272, 280 (approved in *Hallinger* v. *Davis,* 146 U. S. 314, 320; *Holden* v. *Hardy,* 169 U. S. 366, 390, but see *Lowe* v. *Kansas,* 163 U. S. 81, 85). Of course, the part of the Constitution then

before the court was the Fifth Amendment. If any different meaning of the same words, as they are used in the Fourteenth Amendment, can be conceived, none has yet appeared in judicial decision. "A process of law," said Mr. Justice Matthews, commenting on this statement of Mr. Justice Curtis, "which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and this country." *Hurtado* v. *California,* 110 U. S. 516, 528.

Second. It does not follow, however, that a procedure settled in English law at the time of the emigration, and brought to this country and practiced by our ancestors, is an essential element of due process of law. If that were so the procedure of the first half of the seventeenth century would be fastened upon the American jurisprudence like a straight-jacket, only to be unloosed by constitutional amendment. That, said Mr. Justice Matthews, in the same case, p. 529, "would be to deny every quality of the law but its age, and to render it incapable of progress or improvement." *Holden* v. *Hardy,* 169 U. S. 366, 388; *Brown* v. *New Jersey,* 175 U. S. 172, 175.

Third. But, consistently with the requirements of due process, no change in ancient procedure can be made which disregards those fundamental principles, to be ascertained from time to time by judicial action, which have relation to process of law and protect the citizen in his private right, and guard him against the arbitrary action of government. This idea has been many times expressed in differing words by this court, and it seems well to cite some expressions of it. The words due process of law "were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." *Bank of Columbia* v. *Okely,* 4 Wh. 235, 244 (approved in *Hurtado* v. *California,* 110 U. S. 516, 527; *Leeper* v. *Texas,* 139 U. S. 462, 468; *Scott* v. *McNeal,* 154 U. S. 34, 45). "This court has never attempted to define

with precision the words 'due process of law.' . . . It is
sufficient to say that there are certain immutable principles
of justice which inhere in the very idea of free government
which no member of the Union may disregard." *Holden* v.
*Hardy*, 169 U. S. 366, 389. "The same words refer to that
law of the land in each State, which derives its authority from
the inherent and reserved powers of the State, exerted within
the limits of those fundamental principles of liberty and justice
which lie at the base of all our civil and political institutions."
*In re Kemmler*, 136 U. S. 436, 448. "The limit of the full con-
trol which the State has in the proceedings of its courts, both
in civil and criminal cases, is subject only to the qualification
that such procedure must not work a denial of fundamental
rights or conflict with specific and applicable provisions of
the Federal Constitution." *West* v. *Louisiana*, 194 U. S. 258,
263.

The question under consideration may first be tested by
the application of these settled doctrines of this court.   If
the statement of Mr. Justice Curtis, as elucidated in *Hurtado*
v. *California*, is to be taken literally, that alone might almost
be decisive.  For nothing is more certain, in point of historical
fact, than that the practice of compulsory self-incrimination
in the courts and elsewhere existed for four hundred years
after the granting of Magna Carta, continued throughout
the reign of Charles I (though then beginning to be seriously
questioned), gained at least some foothold among the early
colonists of this country, and was not entirely omitted at trials
in England until the eighteenth century.  Wigmore on Evi-
dence, § 2250 (see for the Colonies, note 108); Hallam's Con-
stitutional History of England, ch. VIII, 2 Widdleton's Ameri-
can ed., 37 (describing the criminal jurisdiction of the Court
of Star Chamber); Bentham's Rationale of Judicial Evidence,
book IX, ch. III, § IV.

Sir James Fitzjames Stephen, in his studies of the reports
of English trials for crime, has thrown much light on the
existence of the practice of questioning persons accused of

crime and its gradual decay. He considers, first, a group of trials which occurred between 1554 and 1637. Speaking of the trial before the jury, he says:

"The prisoner, in nearly every instance, asked, as a favor, that he might not be overpowered by the eloquence of counsel denouncing him in a set speech, but, in consideration of the weakness of his memory, might be allowed to answer separately to the different matters which might be alleged against him. This was usually granted, and the result was that the trial became a series of excited altercations between the prisoner and the different counsel opposed to him. Every statement of counsel operated as a question to the prisoner, and indeed they were constantly thrown into the form of questions, the prisoner either admitting or denying or explaining what was alleged against him. The result was that, during the period in question, the examination of the prisoner, which is at present scrupulously and I think even pedantically avoided, was the very essence of the trial, and his answers regulated the production of the evidence; the whole trial, in fact, was a long argument between the prisoner and counsel for the Crown, in which they questioned each other and grappled with each other's arguments with the utmost eagerness and closeness of reasoning." Stephen, 1 Hist. of the Crim. Law, 325.

This description of the questioning of the accused and the meeting of contending arguments finds curious confirmation in the report of the trial, in 1637, of Ann Hutchinson (which resulted in banishment), for holding and encouraging certain theological views which were not approved by the majority of the early Massachusetts rulers. 1 Hart's American History Told by Contemporaries, 382. The trial was presided over and the examination very largely conducted by Governor Winthrop, who had been for some years before his emigration an active lawyer and admitted to the Inner Temple. An examination of the report of this trial will show that he was not aware of any privilege against self-incrimination or conscious of

any duty to respect it. Stephen says of the trials between 1640 and 1660 (*Ib.*, 358): "In some cases the prisoner was questioned, but never to any greater extent than that which it is practically impossible to avoid when a man has to defend himself without counsel. When so questioned the prisoners usually refused to answer." He further says (*Ib.*, 440): "Soon after the Revolution of 1688 the practice of questioning the prisoner died out." But committing magistrates were authorized to take the examination of persons suspected, which if not under oath, was admissible against him on his trial, until by the 11 & 12 Vict., ch. 2, the prisoner was given the option whether he would speak, and warned that what he said might be used against him. But even now there seems to be a very well-recognized and important exception in English law to the rule that no person can be compelled to furnish evidence against himself. A practice in bankruptcy has existed from ancient times, and still exists, which would not be constitutionally possible under our national bankruptcy law or under the insolvency law of any State whose constitution contains the customary prohibition of compulsory self-incrimination. The Bankruptcy Act of 1 James I, ch. 15, § 7 (1603), authorized the commissioners of bankruptcy to compel, by commitment if necessary, the bankrupt to submit to an examination touching his estate and dealings. The provision was continued in the subsequent acts, and in 1820, in *Ex parte Cossens*, Buck, Bkcy. Cases, 531, 540, Lord Eldon, in the course of a discussion of the right to examine a bankrupt, held that he could be compelled to disclose his violations of law in respect of his trade and estate, and, while recognizing the general principle of English law, that no one could be compelled to incriminate himself, said: "I have always understood the proposition to admit of a qualification with respect to the jurisdiction in bankruptcy." The act of 6 Geo. IV, ch. 16, § 36 (1825), authorized the compulsory examination of the bankrupt "touching all matters relating either to his trade, dealings, or estate, or which may tend to disclose any

secret grant, conveyance or concealment of his lands." The act of 12 & 13 Vict., ch. 106, § 117 (1849), contained the same provision. Construing these acts, it was held that the bankrupt must answer, though his answer might furnish evidence of his crime, and even if an indictment were pending against him, and that the evidence thus compelled was admissible on his trial for crime. *Re Heath*, 2 D. & Ch. 214; *Re Smith*, 2 D. & Ch. 230, 235; *Reg.* v. *Scott*, Dearsley & Bell, 47; *Reg.* v. *Cross*, 7 Cox C. C. 226; *Reg.* v. *Widdop*, L. R. 2 C. C. R. 3. The act of 46 & 47 Vict., ch. 52, § 17 (1883), which we understand to be (with some amendment not material here) the present law, passed after the decisions cited, expressly provided that the examination shall be taken in writing and signed by the debtor, "and may thereafter be used in evidence against him." It has since been held that other evidence of his testimony than that written and signed by him may be used. *Reg.* v. *Erdheim* (1896), 2 Q. B. D. 260, and see *Rex* v. *Pike* (1902), 1 K. B. 552.[1] It is to be observed that not until 1883 did Parliament, which has an unlimited legislative power, expressly provide that the evidence compelled from the bankrupt could be used in proof of an indictment against him. The rule had been previously firmly established by judicial decisions upon statutes simply authorizing a compulsory examination. If the rule had been thought to be in conflict with "the law of the land" of Magna Carta, "a sacred text, the nearest approach to an irrepealable, 'fundamental statute' that England has ever had," 1 Pollock & Maitland, 152, it is inconceivable that such a consideration would not have received some attention from counsel and judges. We think it is manifest, from this review of the origin, growth, extent and limits of the exemption from compulsory self-incrimination in the English law, that it is not regarded as a part of the law of the land of Magna Carta or the due process of law, which

---

[1] In certain offenses, which may be generally described as embezzlements, the evidence compelled from a bankrupt cannot be used against him. 24 & 25 Vict., ch. 96, § 85; 53 & 54 Vict., ch. 71, § 27.

has been deemed an equivalent expression, but, on the contrary, is regarded as separate from and independent of due process. It came into existence not as an essential part of due process, but as a wise and beneficent rule of evidence developed in the course of judicial decision. This is a potent argument when it is remembered that the phrase was borrowed from English law and that to that law we must look at least for its primary meaning.

But without repudiating or questioning the test proposed by Mr. Justice Curtis for the court, or rejecting the inference drawn from English law, we prefer to rest our decision on broader grounds, and inquire whether the exemption from self-incrimination is of such a nature that it must be included in the conception of due process. Is it a fundamental principle of liberty and justice which inheres in the very idea of free government and is the inalienable right of a citizen of such a government? If it is, and if it is of a nature that pertains to process of law, this court has declared it to be essential to due process of law. In approaching such a question it must not be forgotten that in a free representative government nothing is more fundamental than the right of the people through their appointed servants to govern themselves in accordance with their own will, except so far as they have restrained themselves by constitutional limits specifically established, and that in our peculiar dual form of government nothing is more fundamental than the full power of the State to order its own affairs and govern its own people, except so far as the Federal Constitution expressly or by fair implication has withdrawn that power. The power of the people of the States to make and alter their laws at pleasure is the greatest security for liberty and justice, this court has said in *Hurtado* v. *California, supra.* We are not invested with the jurisdiction to pass upon the expediency, wisdom or justice of the laws of the States as declared by their courts, but only to determine their conformity with the Federal Constitution and the paramount laws enacted pursuant to it. Under the guise of interpreting the Constitution we must

take care that we do not import into the discussion our own personal views of what would be wise, just and fitting rules of government to be adopted by a free people and confound them with constitutional limitations. The question before us is the meaning of a constitutional provision which forbids the States to deny to any person due process of law. In the decision of this question we have the authority to take into account only those fundamental rights which are expressed in that provision, not the rights fundamental in citizenship, state or National, for they are secured otherwise, but the rights fundamental in due process, and therefore an essential part of it. We have to consider whether the right is so fundamental in due process that a refusal of the right is a denial of due process. One aid to the solution of the question is to inquire how the right was rated during the time when the meaning of due process was in a formative state and before it was incorporated in American constitutional law. Did those who then were formulating and insisting upon the rights of the people entertain the view that the right was so fundamental that there could be no due process without it? It has already appeared that, prior to the formation of the American Constitutions, in which the exemption from compulsory self-incrimination was specifically secured, separately, independently, and side by side with the requirement of due process, the doctrine was formed, as other doctrines of the law of evidence have been formed, by the course of decision in the courts covering a long period of time. Searching further, we find nothing to show that it was then thought to be other than a just and useful principle of law. None of the great instruments in which we are accustomed to look for the declaration of the fundamental rights made reference to it. The privilege was not dreamed of for hundreds of years after Magna Carta (1215), and could not have been implied in the "law of the land" there secured. The Petition of Right (1629), though it insists upon the right secured by Magna Carta to be condemned only by the law of the land, and sets forth by way of grievance divers violations of

it, is silent upon the practice of compulsory self-incrimination, though it was then a matter of common occurrence in all the courts of the realm. The Bill of Rights of the first year of the reign of William and Mary (1689) is likewise silent, though the practice of questioning the prisoner at his trial had not then ceased. The negative argument which arises out of the omission of all reference to any exemption from compulsory self-incrimination in these three great declarations of English liberty (though it is not supposed to amount to a demonstration) is supported by the positive argument that the English Courts and Parliaments, as we have seen, have dealt with the exemption as they would have dealt with any other rule of evidence, apparently without a thought that the question was affected by the law of the land of Magna Carta, or the due process of law which is its equivalent.

We pass by the meager records of the early colonial time, so far as they have come to our attention, as affording light too uncertain for guidance. See Wigmore, § 2250, note 108; 2 Hennings St. at Large, 422 (Va., 1677); 1 Winthrop's History of New England, 47, Provincial Act, 4 W. & M. Ancient Charters, Massachusetts, 214. Though it is worthy of note that neither the declaration of rights of the Stamp Act Congress (1765) nor the declaration of rights of the Continental Congress (1774) nor the ordinance for the government of the Northwestern Territory included the privilege in their enumeration of fundamental rights.

But the history of the incorporation of the privilege in an amendment to the National Constitution is full of significance in this connection. Five States, Delaware, Pennsylvania, New Jersey, Georgia and Connecticut, ratified the Constitution without proposing amendments. Massachusetts then followed with a ratification, accompanied by a recommendation of nine amendments, none of which referred to the privilege; Maryland with a ratification without proposing amendments; South Carolina with a ratification accompanied by a recommendation of four amendments, none of which referred to the privilege,

and New Hampshire with a ratification accompanied by a recommendation of twelve amendments, none of which referred to the privilege. The nine States requisite to put the Constitution in operation ratified it without a suggestion of incorporating this privilege. Virginia was the tenth State to ratify, proposing, by separate resolution, an elaborate Bill of Rights under twenty heads, and in addition twenty amendments to the body of the Constitution. Among the rights enumerated as "essential and inalienable" is that no man "can be compelled to give evidence against himself," and "no freeman ought to be deprived of his life, liberty or property but by the law of the land." New York ratified with a proposal of numerous amendments and a declaration of rights which the convention declared could not be violated and were consistent with the Constitution. One of these rights was that "No person ought to be taken, imprisoned or deprived of his freehold, or be exiled or deprived of his privileges, franchises, life, liberty or property but by due process of law;" and another was that "in all criminal prosecutions the accused . . . should not be compelled to give evidence against himself." North Carolina and Rhode Island were the last to ratify, each proposing a large number of amendments, including the provision that no man "can be compelled to give evidence against himself;" and North Carolina, that "no freeman ought to be . . . deprived of his life, liberty or property but by the law of the land;" and Rhode Island, that "no freeman ought to be . . . deprived of his life, liberty or property but by the trial by jury, or by the law of the land."

Thus it appears that four only of the thirteen original States insisted upon incorporating the privilege in the Constitution, and they separately and simultaneously with the requirement of due process of law, and that three States proposing amendments were silent upon this subject. It is worthy of note that two of these four States did not incorporate the privilege in their own constitutions, where it would have had a much wider field of usefulness, until many years after. New York

in 1821 and Rhode Island in 1842 (its first constitution). This survey does not tend to show that it was then in this country the universal or even general belief that the privilege ranked among the fundamental and inalienable rights of mankind; and what is more important here, it affirmatively shows that the privilege was not conceived to be inherent in due process of law, but on the other hand a right separate, independent and outside of due process. Congress, in submitting the amendments to the several States, treated the two rights as exclusive of each other. Such also has been the view of the States in framing their own constitutions, for in every case, except in New Jersey and Iowa, where the due process clause or its equivalent is included, it has been thought necessary to include separately the privilege clause. Nor have we been referred to any decision of a state court save one (*State* v. *Height*, 117 Iowa, 650), where the exemption has been held to be required by due process of law. The inference is irresistible that it has been the opinion of constitution makers that the privilege, if fundamental in any sense, is not fundamental in due process of law, nor an essential part of it. We believe that this opinion is proved to have been correct by every historical test by which the meaning of the phrase can be tried.

The decisions of this court, though they are silent on the precise question before us, ought to be searched to discover if they present any analogies which are helpful in its decision. The essential elements of due process of law, already established by them, are singularly few, though of wide application and deep significance. We are not here concerned with the effect of due process in restraining substantive laws, as, for example, that which forbids the taking of private property for public use without compensation. We need notice now only those cases which deal with the principles which must be observed in the trial of criminal and civil causes. Due process requires that the court which assumes to determine the rights of parties shall have jurisdiction, *Pennoyer* v. *Neff*, 95 U. S. 714, 733; *Scott* v. *McNeal*, 154 U. S. 34; *Old Wayne Life Association*

v. *McDonough*, 204 U. S. 8, and that there shall be notice and opportunity for hearing given the parties, *Hovey* v. *Elliott*, 167 U. S. 409; *Roller* v. *Holly*, 176 U. S. 398; and see *Londoner* v. *Denver*, 210 U. S. 373. Subject to these two fundamental conditions, which seem to be universally prescribed in all systems of law established by civilized countries, this court has up to this time sustained all state laws, statutory or judicially declared, regulating procedure, evidence and methods of trial, and held them to be consistent with due process of law: *Walker* v. *Sauvinet*, 92 U. S. 90; *Re Converse*, 137 U. S. 624; *Caldwell* v. *Texas*, 137 U. S. 692; *Leeper* v. *Texas*, 139 U. S. 462; *Hallinger* v. *Davis*, 146 U. S. 314; *McNulty* v. *California*, 149 U. S. 645; *McKane* v. *Durston*, 153 U. S. 684; *Iowa Central* v. *Iowa*, 160 U. S. 389; *Lowe* v. *Kansas*, 163 U. S. 81; *Allen* v. *Georgia*, 166 U. S. 138; *Hodgson* v. *Vermont*, 168 U. S. 262; *Brown* v. *New Jersey*, 175 U. S. 172; *Bolln* v. *Nebraska*, 176 U. S. 83; *Maxwell* v. *Dow*, 176 U. S. 581; *Simon* v. *Craft*, 182 U. S. 427; *West* v. *Louisiana*, 194 U. S. 258; *Marvin* v. *Trout*, 199 U. S. 212; *Rogers* v. *Peck*, 199 U. S. 425; *Howard* v. *Kentucky*, 200 U. S. 164; *Rawlins* v. *Georgia*, 201 U. S. 638; *Felts* v. *Murphy*, 201 U. S. 123.

Among the most notable of these decisions are those sustaining the denial of jury trial both in civil and criminal cases, the substitution of informations for indictments by a grand jury, the enactment that the possession of policy slips raises a presumption of illegality, and the admission of the deposition of an absent witness in a criminal case. The cases proceed upon the theory that, given a court of justice which has jurisdiction and acts, not arbitrarily but in conformity with a general law, upon evidence, and after inquiry made with notice to the parties affected and opportunity to be heard, then all the requirements of due process, so far as it relates to procedure in court and methods of trial and character and effect of evidence, are complied with. Thus it was said in *Iowa Central* v. *Iowa*, 160 U. S. 393: "But it is clear that the Fourteenth Amendment in no way undertakes to control the

power of the State to determine by what process legal rights may be asserted or legal obligations be enforced, provided the method of procedure adopted gives reasonable notice and affords fair opportunity to be heard before the issues are decided;" and in *Louisville & Nashville Railroad Company* v. *Schmidt,* 177 U. S. 230, 236: "It is no longer open to contention that the due process clause of the Fourteenth Amendment to the Constitution of the United States does not control mere forms of procedure in state courts or regulate practice therein. All its requirements are complied with, provided in the proceedings which are claimed not to have been due process of law the person condemned has had sufficient notice and adequate opportunity has been afforded him to defend;" and in *Hooker* v. *Los Angeles,* 188 U. S. 314, 318: "The Fourteenth Amendment does not control the power of a State to determine the form of procedure by which legal rights may be ascertained, if the method adopted gives reasonable notice and affords a fair opportunity to be heard;" and in *Rogers* v. *Peck,* 199 U. S. 435: "Due process of law, guaranteed by the Fourteenth Amendment, does not require the State to adopt a particular form of procedure, so long as it appears that the accused has had sufficient notice of the accusation and an adequate opportunity to defend himself in the prosecution." It is impossible to reconcile the reasoning of these cases and the rule which governed their decision with the theory that an exemption from compulsory self-incrimination is included in the conception of due process of law. Indeed the reasoning for including indictment by a grand jury and trial by a petit jury in that conception, which has been rejected by this court in *Hurtado* v. *California* and *Maxwell* v. *Dow,* was historically and in principle much stronger. Clearly appreciating this, Mr. Justice Harlan, in his dissent in each of these cases, pointed out that the inexorable logic of the reasoning of the court was to allow the States, so far as the Federal Constitution was concerned, to compel any person to be a witness against himself. In *Missouri* v. *Lewis,* 101 U. S. 22, Mr. Justice Bradley, speaking

for the whole court, said, in effect, that the Fourteenth Amendment would not prevent a State from adopting or continuing the civil law instead of the common law. This *dictum* has been approved and made an essential part of the reasoning of the decision in *Holden* v. *Hardy*, 169 U. S. 387, 389, and *Maxwell* v. *Dow*, 176 U. S. 598. The statement excludes the possibility that the privilege is essential to due process, for it hardly need be said that the interrogation of the accused at his trial is the practice in the civil law.

Even if the historical meaning of due process of law and the decisions of this court did not exclude the privilege from it, it would be going far to rate it as an immutable principle of justice which is the inalienable possession of every citizen of a free government. Salutary as the principle may seem to the great majority, it cannot be ranked with the right to hearing before condemnation, the immunity from arbitrary power not acting by general laws, and the inviolability of private property. The wisdom of the exemption has never been universally assented to since the days of Bentham; many doubt it to-day, and it is best defended not as an unchangeable principle of universal justice but as a law proved by experience to be expedient. See Wigmore, § 2251. It has no place in the jurisprudence of civilized and free countries outside the domain of the common law, and it is nowhere observed among our own people in the search for truth outside the administration of the law. It should, must and will be rigidly observed where it is secured by specific constitutional safeguards, but there is nothing in it which gives it a sanctity above and before constitutions themselves. Much might be said in favor of the view that the privilege was guaranteed against state impairment as a privilege and immunity of National citizenship, but, as has been shown, the decisions of this court have foreclosed that view. There seems to be no reason whatever, however, for straining the meaning of due process of law to include this privilege within it, because, perhaps, we may think it of great value. The States had guarded the privilege

to the satisfaction of their own people up to the adoption of the Fourteenth Amendment. No reason is perceived why they cannot continue to do so. The power of their people ought not to be fettered, their sense of responsibility lessened, and their capacity for sober and restrained self-government weakened by forced construction of the Federal Constitution. If the people of New Jersey are not content with the law as declared in repeated decisions of their courts, the remedy is in their own hands. They may, if they choose, alter it by legislation, as the people of Maine did when the courts of that State made the same ruling. *State* v. *Bartlett*, 55 Maine, 200; *State* v. *Lawrence*, 57 Maine, 574; *State* v. *Cleaves*, 59 Maine, 298; *State* v. *Banks*, 78 Maine, 490, 492; Rev. Stat. ch. 135, § 19.

We have assumed only for the purpose of discussion that what was done in the case at bar was an infringement of the privilege against self-incrimination. We do not intend, however, to lend any countenance to the truth of that assumption. The courts of New Jersey, in adopting the rule of law which is complained of here, have deemed it consistent with the privilege itself and not a denial of it. The reasoning by which this view is supported will be found in the cases cited from New Jersey and Maine, and see *Reg.* v. *Rhodes* (1899), 1 Q. B. 77; *Ex parte Kops* (1894), A. C. 650. The authorities upon the question are in conflict. We do not pass upon the conflict, because, for the reasons given, we think that the exemption from compulsory self-incrimination in the courts of the States is not secured by any part of the Federal Constitution.

*Judgment affirmed.*

MR. JUSTICE HARLAN, dissenting.

I feel constrained by a sense of duty to express my non-concurrence in the action of the court in this present case.

Twining and Cornell were indicted for a criminal offense in a New Jersey court and having been found guilty by a jury were sentenced, respectively, to imprisonment for six and

four years. The judgment of conviction was affirmed, first in the Supreme Court of the State, afterwards in the Court of Errors and Appeals. The case was brought here for review and the accused assigned for error that the mode of proceeding during the trial was such as to deny them a right secured by the Constitution of the United States, namely, the right of an accused not to be compelled to testify against himself.

Upon this point the court, in the opinion just delivered, says: "We have assumed, only for the purpose of discussion, that what was done in the case at bar was an infringement of the privilege against self-incrimination." But the court takes care to add immediately: "We do not intend, however, to lend any countenance to the truth of that assumption. The courts of New Jersey, in adopting the rule of law which is complained of here, have deemed it consistent with the privilege itself."

It seems to me that the first inquiry on this writ of error should have been whether, upon the record before us, that which was actually done in the trial court amounted, in law, to a violation of that privilege. If the court was not prepared to hold, upon the record before it, that the privilege of immunity from self-incrimination had been actually violated, then, I submit, it ought not to have gone further and held it to be competent for a State, despite the granting of immunity from self-incrimination by the Federal Constitution, to compel one accused of crime to be a witness against himself. Whether a State is forbidden by the Constitution of the United States to violate the principle of immunity from self-incrimination is a question which it is clearly unnecessary to decide now, unless what was, in fact, done at the trial was inconsistent with that immunity. But, although expressly declaring that it will not lend any *countenance* to the *truth* of the *assumption* that the proceedings below were in disregard of the maxim, *Nemo tenetur seipsum accusare,* and without saying whether there was, in fact, any substantial violation of the privilege

of immunity from self-incrimination, the court, for the purpose
only of discussion, has entered upon the academic inquiry
whether a State may, without violating the Constitution of
the United States, compel one accused of crime to be a wit-
ness against himself—a question of vast moment, one of such
transcendent importance that a court ought not to decide it
unless the record before it requires that course to be adopted.
It is entirely consistent with the opinion just delivered that
the court thinks that what is complained of as having been
done at the trial of the accused was not, in law, an infringe-
ment of the privilege of immunity from self-incrimination.
Yet, as stated, the court, in its wisdom, has forborne to say
whether, in its judgment, that privilege was, in fact, violated
in the state court, but simply, for the purpose of *discussion*,
has proceeded on the *assumption* that the privilege was disre-
garded at the trial.

As a reason why it takes up first the question of the power
of a State, so far as the Federal Constitution is concerned, to
compel self-incrimination, the court says that if the right here
asserted is not a Federal right that is an end of the case, and
it must not go further. It would, I submit, have been more
appropriate to say that if no ground whatever existed, under
the facts disclosed by the record, to contend that a Federal
right had been violated, this court would be without authority
to go further and express its opinion on an abstract question
relating to the powers of the State under the Constitution.

What I have suggested as to the proper course of procedure
in this court is supported by our action in *Shoener* v. *Penn-
sylvania,* 207 U. S. 188, 195. That was a criminal case, brought
here from the Supreme Court of Pennsylvania—the accused,
who was convicted, insisting that the proceeding against him
in the state court was in violation of the clause of the Federal
Constitution declaring that no person shall be subject for the
same offense to be twice put in jeopardy of life or limb.
Upon looking into the record of that case we found that the
accused had not been, previously, put in legal jeopardy for

the same offense. We went no further, but dismissed the writ of error, declining to consider the grave constitutional question pressed upon our attention, namely, whether the jeopardy clause of the Federal Constitution operated as a restraint upon the *States* in the execution of their criminal laws. But as a different course has been pursued in this case, I must of necessity consider the sufficiency of the grounds upon which the court bases its present judgment of affirmance.

The court, in its consideration of the relative rights of the United States and of the several States, holds, in this case, that, *without violating the Constitution of the United States,* a State can *compel* a person accused of crime to testify against himself. In my judgment, immunity from self-incrimination is protected against hostile state action, not only by that clause in the Fourteenth Amendment declaring that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," but by the clause, in the same Amendment, "nor shall any State deprive any person of life, liberty or property, without due process of law." No argument is needed to support the proposition that, whether manifested by statute or by the final judgment of a court, state action if liable to the objection that it abridges the privileges or immunities of National citizenship must also be regarded as wanting in the due process of law enjoined by the Fourteenth Amendment, when such state action substantially affects life, liberty or property.

At the time of the adoption of the Fourteenth Amendment immunity from self-incrimination was one of the privileges or immunities belonging to citizens, for the reason that the Fifth Amendment, speaking in the name of the People of the United States, had declared, in terms, that no person "shall be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law." That Amendment, it was long ago decided, operated as a restriction on the exercise of powers by the United States or by Federal tribunals and agencies, but

did not impose any restraint upon a State or upon a state tribunal or agency. The original Amendments of the Constitution had their origin, as all know, in the belief of many patriotic statesmen in the States then composing the Union, that under the Constitution, as originally submitted to the People for adoption or rejection, the National Government might disregard the fundamental principles of Anglo-American liberty for the maintenance of which our fathers took up arms against the mother country.

, What, let me inquire, must then have been regarded as principles that were fundamental in the liberty of the citizen? Every student of English history will agree that long before the adoption of the Constitution of the United States certain principles affecting the life and liberty of the subject had become firmly established in the jurisprudence of England and were deemed vital to the safety of freemen, and that among those principles was the one that no person accused of crime could be compelled to be a witness against himself. It is true that at one time in England the practice of "questioning the prisoner" was enforced in Star Chamber proceedings. But we have the authority of Sir James Fitzjames Stephen, in his History of the Criminal Law of England, for saying that soon after the Revolution of 1688 the practice of questioning the prisoner died out. Vol. 1, p. 440. The liberties of the English people had then been placed on a firmer foundation. Personal liberty was thenceforward jealously guarded. Certain it is, that when the present Government of the United States was established it was the belief of all liberty-loving men in America that real, genuine freedom could not exist in any country that recognized the power of government to *compel* persons accused of crime to be witnesses against themselves. And it is not too much to say that the wise men who laid the foundations of our constitutional government would have stood aghast at the suggestion that immunity from self-incrimination was not among the essential, fundamental principles of English law. An able writer on English and American constitutional

law has recently well said: "When the first Continental Congress of 1774 claimed to be entitled to the benefit, not only of the common law of England, but of such of the English statutes. as existed at the time of the colonization, and which they had by experience found to be applicable to their several local and other circumstances, they simply declared the basic principle of English law that English subjects going to a new and uninhabited country carry with them, as their birthright, the laws of England existing when the colonization takes place.. . . . English law, public and private, continued in force in all the States that became sovereign in 1776, each State declaring for itself the date from which it would recognize it." Taylor, The Science of Jurisprudence, 436, 437. It is indisputably established that, despite differences in forms of government, the people in the colonies were a unit as to certain leading principles, among which was the principle that the people were entitled to "enjoy the rights and privileges of British-born subjects and the benefit of the common laws of England;" 1 Story, § 163, and that (to use the words of the Continental Congress of 1774) "by emigration to the colonies, the people by no means forfeited, surrendered or lost any of those rights, but that they were then, and their descendants are now, entitled to the exercise and enjoyment of them as their local and other circumstances enable them to exercise and enjoy."

Can there be any doubt that at the opening of the War of Independence the people of the colonies claimed as one of their birthrights the privilege of immunity from self-incrimination? This question can be answered in but one way. If at the beginning of the Revolutionary War any lawyer had claimed that one accused of crime could lawfully be compelled to testify against himself, he would have been laughed at by his brethren of the bar, both in England and America. In accordance with this universal view as to the rights of freemen, Virginia, in its Convention of May, 1776—in advance, be it observed, of the Declaration of Independence—made a

Declaration (drawn entirely by the celebrated George Mason) which set forth certain rights as pertaining to the people of that State and to their posterity "as the basis and foundation of government." Among those rights (that famous Declaration distinctly announced) was the right of a person not to be compelled to give evidence against himself. Precisely the same declaration was made in Pennsylvania by its Convention assembled at Philadelphia on the fifteenth of July, 1776. Vermont, by its Convention of 1777, said: "Nor can he [a man accused of crime] be compelled to give evidence against himself." Maryland in 1776 declared that "no man ought to be compelled to give evidence against himself, in a court of criminal law." Massachusetts, in its constitution of 1780, provided that "no subject shall be . . . compelled to accuse, or to furnish evidence against himself." The same provision was made by New Hampshire in its constitution of 1784. And North Carolina as early as 1776 recognized the privilege of immunity from self-incrimination by declaring, in its constitution, that a man "shall not be compelled to give evidence against himself." These explicit declarations in the constitutions of leading colonies, before the submission of the National Constitution to the People for adoption or rejection, caused patriotic men, whose fidelity to American liberty no one doubted, to protest that that instrument was defective in that it furnished no express guaranty against the violation by the National Government of the personal rights that inhered in liberty. Nothing is made clearer by the history of our country than that the Constitution would not have been accepted by the requisite number of States, but for the understanding, on all sides, that it should be promptly amended so as to meet this objection. So, when the first Congress met, there was entire unanimity among statesmen of that day as to the necessity and wisdom of having a National Bill of Rights which would, beyond all question, secure against Federal encroachment all the rights, privileges and immunities which, everywhere and by everybody in America, were then recognized as

fundamental in Anglo-American liberty. Hence the prompt incorporation into the Supreme Law of the Land of the original amendments. By the Fifth Amendment, as already stated, it was expressly declared that no one should be compelled in a criminal case to be a witness against himself. Those Amendments being adopted by the Nation, the People no longer feared that the United States or any Federal agency could exert power that was inconsistent with the fundamental rights recognized in those Amendments. It is to be observed that the Amendments introduced no principle not already familiar to liberty-loving people. They only put in the form of constitutional sanction, as barriers against oppression, the principles which the people of the colonies, with entire unanimity, deemed vital to their safety and freedom.

Still more. At the close of the late Civil War, which had seriously disturbed the foundations of our governmental system, the question arose whether provision should not be made by constitutional amendments to secure against attack by the *States* the rights, privileges and immunities which, by the original Amendments, had been placed beyond the power of the United States or any Federal agency to impair or destroy. Those rights, privileges and immunities had not then, in terms, been guarded by the National Constitution against impairment or destruction by the States, although, before the adoption of the Fourteenth Amendment, every State, without, perhaps, an exception, had, in some form, recognized, as part of its fundamental law, most, if not all, the rights and immunities mentioned in the original Amendments, among them immunity from self-incrimination. This is made clear by the opinion of the court in the present case. The court says: "The exemption from testimonial compulsion, that is, from disclosure as *a witness of evidence against one's self, forced by any form of legal process, is universal in American law*, though there may be a difference as to its exact scope and limits. At the time of the formation of the Union, the principle that no person could be compelled to be a witness against himself

had become embodied in the common law and distinguished it from all other systems of jurisprudence. *It was generally regarded then, as now, as a privilege of great value, a protection to the innocent though a shelter to the guilty, and a safeguard against heedless, unfounded or tyrannical prosecutions."* Such was the situation, the court concedes, at the time the Fourteenth Amendment was prepared and adopted. That Amendment declared that all persons born or naturalized in the United States and subject to its jurisdiction are citizens of the United States, "and of the State wherein they reside." Momentous as this declaration was, in its political consequences, it was not deemed sufficient for the complete protection of the essential rights of National citizenship and personal liberty. Although the Nation was restrained by existing constitutional provisions from encroaching upon those rights, yet so far as the Federal Constitution was concerned, the States could at that time have dealt with those rights upon the basis entirely of their own constitution and laws. It was therefore deemed necessary that the Fourteenth Amendment should, in the name of the United States forbid, as it expressly does, any *State* from making or enforcing a law that will abridge the privileges or immunities of citizens of the United States, or deprive any person of life, liberty or property without due process of law. The privileges and immunities mentioned in the original Amendments, and universally regarded as our heritage of liberty from the common law, were thus secured to every citizen of the United States and placed beyond assault by any government, Federal or state, and due process of law, in all public proceedings affecting life, liberty or property, were enjoined equally upon the Nation and the States.

What, then, were the privileges and immunities of citizens of the United States which the Fourteenth Amendment guarded against encroachment by the States? Whatever they were, that Amendment placed them beyond the power of any State to abridge. And what were the rights of life and liberty which the Amendment protected? Whatever they were, that Amend-

ment guarded them against any hostile state action that was wanting in due process of law.

I will not attempt to enumerate all the privileges and immunities which *at that time* belonged to citizens of the United States.  But I confidently assert that among such privileges was the privilege of immunity from self-incrimination which the People of the United States, by adopting the Fifth Amendment, had placed beyond Federal encroachment.  Can such a view be deemed unreasonable in the face of the fact, frankly conceded in the opinion of the court, that at common law, as well at the time of the formation of the Union and when the Fourteenth Amendment was adopted, immunity from self-incrimination was a privilege "universal in American law," was everywhere deemed "of great value, a protection to the innocent though a shelter to the guilty and a safeguard against heedless, unfounded or tyrannical prosecutions"?  Is it conceivable that a privilege or immunity of such a priceless character, one expressly recognized in the Supreme Law of the Land, one thoroughly interwoven with the history of Anglo-American liberty, was not in the mind of the country when it declared, in the Fourteenth Amendment, that no State shall abridge the privileges or immunities of citizens of the United States?  The Fourteenth Amendment would have been disapproved by every State in the Union if it had saved or recognized the right of a State to compel one accused of crime, in its courts, to be a witness against himself.  We state the matter in this way because it is common knowledge that the compelling of a person to criminate himself shocks or ought to shock the sense of right and justice of every one who loves liberty.  Indeed, this court has not hesitated thus to characterize the Star Chamber method of compelling an accused to be a witness against himself.  In *Boyd* v. *United States*, 116 U. S. 616, 631, 633, will be found some weighty observations by Mr. Justice Bradley, delivering the judgment of the court, as to the scope and meaning of the Fourth and Fifth Amendments.  The court, speaking by that eminent jurist, said:

"Now it is elementary knowledge, that one cardinal rule of the court of chancery is never to decree a discovery which might *tend to convict the party of a crime*, or to forfeit his property.   And any *compulsory* discovery *by extorting the party's oath*, or compelling the production of his private books and papers, *to convict him of crime*, or to forfeit his property, *is contrary to the principles of a free government.   It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American.   It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom.*"   Again: "We have already noticed the intimate relation between the two Amendments.   They throw great light on each other.   For, the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment.   And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself."   These observations were referred to approvingly in *Counselman* v. *Hitchcock*, 142 U. S. 547, 580, 581.

I am of opinion that as immunity from self-incrimination was recognized in the Fifth Amendment of the Constitution and placed beyond violation by any Federal agency, it should be deemed one of the immunities of citizens of the United States which the Fourteenth Amendment in express terms forbids any State from abridging—as much so, for instance, as the right of free speech (Amdt. II), or the exemption from cruel or unusual punishments (Amdt. VIII), or the exemption from being put twice in jeopardy of life or limb for the same offense (Amdt. V), or the exemption from unreasonable searches

and seizures of one's person, house, papers or effects (Amdt. IV). Even if I were anxious or willing to cripple the operation of the Fourteenth Amendment by strained or narrow interpretations, I should feel obliged to hold that when that Amendment was adopted all these last-mentioned exemptions were among the immunities belonging to citizens of the United States, which, after the adoption of the Fourteenth Amendment, no State could impair or destroy. But, as I read the opinion of the court, it will follow from the general principles underlying it, or from the reasoning pursued therein, that the Fourteenth Amendment would be no obstacle whatever in the way of a state law or practice under which, for instance, cruel or unusual punishments (such as the thumb screw, or the rack or burning at the stake) might be inflicted. So of a state law which infringed the right of free speech, or authorized unreasonable searches or seizures of persons, their houses, papers or effects, or a state law under which one accused of crime could be put in jeopardy twice or oftener, at the pleasure of the prosecution, for the same offense.

It is my opinion also that the right to immunity from self-incrimination cannot be taken away by any State consistently with the clause of the Fourteenth Amendment that relates to the deprivation by the State of life or liberty without due process of law. This view is supported by what Mr. Justice Miller said for the court in *Davidson* v. *New Orleans,* 96 U. S. 97, 101, 102. That great judge, delivering the opinion in that case, said: "The prohibition against depriving the citizen or subject of his life, liberty, or property without due process of law, is not new in the constitutional history of the English race. It is not new in the constitutional history of this country, and it was not new in the Constitution of the United States when it became a part of the Fourteenth Amendment, in the year 1866." After observing that the equivalent of the phrase "due process of law," according to Lord Coke, is found in the words "law of the land," in the Great Charter, in connection with the guarantees of the rights of the subject

against the oppression of the crown, the court said: "In the series of amendments to the Constitution of the United States, proposed and adopted immediately after the organization of the government, which were dictated by the jealousy of the States as further limitations upon the power of the Federal Government, it is found in the Fifth, in connection *with other guarantees of personal. rights of the same character.*" *Among these guarantees* this court distinctly said was protection against being twice tried for the same offense, and protection "*against the accused being compelled, in a criminal case, to testify against himself.*" Again, said the court: "It is easy to see that when the great barons of England wrung from King John, at the point of the sword, the concession that neither their lives nor their property should be disposed of by the crown, except as provided by the law of the land, they meant by 'law of the land' the ancient and customary laws of the English people, or laws enacted by the Parliament of which those barons were a controlling element. It was not in their minds, therefore, to protect themselves against the enactment of laws by the Parliament of England. But when, in the year of grace 1866, there is placed in the Constitution of the United States a declaration that 'no State shall deprive any person of life, liberty, or property without due process of law,' can a State make any thing due process of law which, by its own legislation, it chooses to declare such? To affirm this is to hold that the prohibition to the States is of no avail, or has no application where the invasion of private rights is affected under the forms of state legislation."

I cannot support any judgment declaring that immunity from self-incrimination is not one of the privileges or immunities of National citizenship, nor a part of the liberty guaranteed by the Fourteenth Amendment against hostile state action. The declaration of the court, in the opinion just delivered, that immunity from self-incrimination is of great value, a protection to the innocent and a safeguard against unfounded and tyrannical prosecutions, meets my cordial

approval. And the court having heretofore, upon the fullest consideration, declared that the compelling of a citizen of the United States, charged with crime, to be a witness against himself, was a rule abhorrent to the instincts of Americans, was in violation of universal American law, was contrary to the principles of free government and a weapon of despotic power which could not abide the pure atmosphere of political liberty and personal freedom, I cannot agree that a State may make that rule a part of its law and binding on citizens, despite the Constitution of the United States. No former decision of this court requires that we should now so interpret the Constitution.