STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES O'LEARY, DEFENDANT-APPELLANT.

Argued September 4, 1957—Decided October 14, 1957.

*Mr. Edward J. Madden* argued the cause for appellant (*Messrs. Cole, Madden & Weener,* attorneys).

*Mr. Archibald Kreiger,* Deputy Attorney-General, argued the cause for the State (*Mr. Charles S. Joelson,* Deputy Attorney-General, Acting Passaic County Prosecutor, attorney; *Mr. Julius A. Feinberg,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

WACHENFELD, J.   The appellant was convicted of second-degree murder in the Law Division of the Superior Court, Passaic County, and appeals directly to this court by virtue of *Art.* VI, *Sec.* V, *par.* 1(c), of the *Constitution of 1947* and of *R. R.* 1:2–1(c).   He was sentenced to the New Jersey State Prison for 10 to 12 years.

On May 2, 1929 Alex Szabo was shot while in the commercial garage of Max Siegendorf in the City of Passaic. Siegendorf was working in his repair shop at about 5:00 P. M.

on the day in question when he heard the sound of a shot. He went outside, walked over to the store portion of his garage, entered the "tire room," and found Szabo slumped in a corner. Szabo had been an occasional visitor to the garage and was known by Siegendorf.

Siegendorf assisted the wounded man to his feet, and Szabo thereupon remarked that he was paralyzed. Siegendorf drove the victim to the office of a Dr. Simon, who recommended that he be taken to a hospital. Accordingly, Siegendorf took Szabo to Beth Israel Hospital, which was near by.

There, at about 6:00 P. M., Dr. Edward Whelan, surgeon-in-chief, examined Szabo and determined from X-rays that a bullet had severed his spinal cord to the left of the third thoracic or dorsal vertebra. Dullness of the victim's lungs was noted, and it was ascertained that there was bleeding into the pleural cavity. Dr. Whelan's prognosis was highly unfavorable, and he informed Szabo that he would die in from three to six hours, suggesting a priest be summoned and also the police.

Thereafter, Detective Potosnak and Lieutenant Cunningham of the Passaic Police force were sent to the hospital. Around 10:00 P. M., Captain Monks arrived and with Detective Potosnak took a statement from Szabo. Szabo stated preliminarily. that "Cockeye" O'Leary had shot him and he knew he was going to die; he felt "sure" of it. He was then questioned by Captain Monks while Detective Potosnak took down the questions and answers on a police department form. This written statement was subsequently marked by Szabo with an "X" in two places, Monks guiding his hand for that purpose. At the trial, it was admitted into evidence as a dying declaration.

In this statement Szabo asserted he realized he was going to die and that he had been shot by four men, two of whom he knew, one "Big Mike who worked for Johnny Jones * * * and a man by the name of O'Leary." The other two assailants were unknown. Szabo related that O'Leary and Big Mike had shot him once while he was standing and once while he was on the ground. Both, he said, had carried

guns in their hands and had stated, "I told you I would get you."

The victim also briefly outlined the source of his difficulty with O'Leary. He said O'Leary had been one of a number of bootleggers running a still in Ramsey and that he, Szabo, had stolen their "ale burner" and then unwittingly sold it back to O'Leary, not realizing it had originally belonged to him.

Szabo went on to describe an accidental meeting with O'Leary, at a busy corner in Passaic on the Tuesday prior to the day of the shooting, where the latter had informed Szabo that he was "out to get" him. Szabo's statement ended with an averment that the facts summarized were all he could tell the police about the shooting.

Early in the morning of the third of May, Detective McCann of the Passaic Police went to Szabo's room with a picture of O'Leary which had been procured from the Jersey City Bureau of Criminal Identification. Szabo identified O'Leary from the picture as one of the men who had shot him. The photograph was admitted into evidence.

Szabo died on May 4, 1929, and on the 24th day of the same month the Passaic County grand jury indicted O'Leary and five others for his murder. Daniel Collins and Herman Groth were arraigned on the same day the indictment was returned and pleaded not guilty, being admitted to bail in the amount of $25,000 each. According to the record before us, no other proceedings were ever taken against them. Three of the defendants, McDonald, Gatto and Pelicastro, were never apprehended.

O'Leary was arraigned on December 7, 1934. After a plea of not guilty, he was released in $10,000 bail and the case against him remained dormant until January of 1957, when Acting Prosecutor Joelson discovered the open indictment. On January 28, 1957 O'Leary was arrested. On February 7, 1957 he was admitted to bail on his own recognizance. The trial started on March 18, 1957.

Siegendorf, Dr. Whelan, Monks, Potosnak and McCann were the most important witnesses for the State. Szabo's

statement was received and the photograph of O'Leary he had identified in the hospital was admitted into evidence. The defendant did not take the stand and offered no evidence save for his insistence that the indictment in question be marked as a defendant's exhibit.

██ The appellant's first contention is that the trial court committed reversible error in charging the jury concerning his failure to take the stand. If the charge were as represented in the appellant's brief, there might be substantial grounds for complaint. The record reveals without dispute, however, that the appellant has misquoted the remarks of the trial judge relating to this aspect of the case. The court charged as follows:

"However, where there is direct evidence of facts within the personal knowledge of the defendant tending to implicate him circumstantially with the offense charged, failure to testify with relation to those facts raises a strong presumption that he could not truthfully deny those facts."

This is identical with the trial court's charge in *State v. Rogers,* approved by us in 19 *N. J.* 218 (1955). The appellant maintains it was erroneous because there was no incriminatory evidence linking him to the crime and therefore nothing to deny. There being no direct evidence of any inculpatory act, the appellant says, there is no premise for an unfavorable inference to be drawn from his failure to testify.

He ignores the fact, however, that Szabo's dying declarations were admitted and were evidence of the appellant's guilt to be considered by the jury. True, they were admissible under an exception to the hearsay rule, but they nevertheless constituted legal evidence, identifying the perpetrator of the crime in question, upon which the jury had a right to act. In the *Rogers* case the evidence was wholly circumstantial in character, while here there was a statement by way of a dying declaration from an eyewitness accusing and identifying O'Leary as the perpetrator of the murder.

Ever since *Parker v. State,* 61 *N. J. L.* 308 (*Sup. Ct.* 1898), affirmed 62 *N. J. L.* 801 (*E. & A.* 1899), our practice has permitted comment by the prosecutor and the court upon the silence of the accused where, as said in *State v. Costa,* 11 *N. J.* 239, 255 (1953), "* * * there are facts in evidence concerning the acts or conduct of the defendant within his personal knowledge which are inculpative or imputative in some degree of guilt, which facts he by his oath can deny."

Charges to the jury embodying this principle have been a fixture of our criminal law, and we can find no error in the present deliverance.

These proceedings present a remarkable chronology which we hope will never be duplicated in the annals of New Jersey criminal jurisprudence. No explanation was given, but, in lieu thereof, an apology is submitted for the unprecedented delay of nearly a quarter of a century between arraignment and prosecution. This dismaying procrastination stands as an inerasable blot on our record of the expeditious administration of criminal justice as we proudly thought it had existed.

Judicial admonitions against delay in the prosecution of criminal cases are abundant and pointed. *State v. Dandridge,* 37 *N. J. Super.* 144, 149 (*App. Div.* 1955) ; *State v. Appice,* 23 *N. J. Super.* 522, 530 (*App. Div.* 1952), affirmed 13 *N. J.* 286 (1953), *certiorari* denied 346 *U. S.* 939, 74 *S. Ct.* 380, 98 *L. Ed.* 427 (1954).

Our law is settled by *State v. Smith,* 10 *N. J.* 84 (1952), where the majority of this court held:

"Defendants never had under the constitutional guaranty of a speedy trial the right to have an indictment dismissed; they merely could apply to the court to fix a day certain and on the failure of the State to proceed they could be discharged on their own recognizance or a judgment of acquittal entered." (10 *N. J.* at *page* 93.)

O'Leary made no application to have a date fixed for trial nor did he ever make a single move to have his case

disposed of. Thus, the facts *sub judice* are entirely different, and less favorable to appellant, from those in the *Smith* case, where the dissent points out that Smith had made demands for a speedy trial which were ignored. Nevertheless, under the highly unusual circumstances present here, the slightest proof of embarrassment occasioned by the delinquency of the prosecution might well, I am sure, have tilted our decision in O'Leary's favor.

But, although appellant's brief mentioned the fact that a "motion was made for his release" and the record shows that before trial notice of motion was given to dismiss the indictment upon the ground that it was 27 years old and the unusual delay had "harassed and prejudiced the defendant," the denial of that motion is not appealed.

On oral argument the court, of its own initiative, tried to ascertain whether appellant had suffered a detrimental change of position or prejudice in any way attributable to the lapse of time involved, but we were unsuccessful. Nowhere in appellant's brief is it claimed that the delay embarrassed him to any degree in making his defense, and the total record, inferentially at least, indicates that what took place, if it did not originate with the appellant, was certainly acquiesced in by him with complete contentment.

We conclude, on the basis of the doctrine enunciated in *State v. Smith, supra,* that appellant should not go free merely because his trial was long delayed, when there is not an iota of evidence nor even a credible affirmative statement to the effect that he was thereby impeded in making his defense.

Indeed, appellant does not even suggest that we reverse simply because a lengthy interval of state inaction intruded between arraignment and trial. The alleged error brought before us is predicated, instead, upon the court's charge to the jury, as follows:

"Accordingly, you are instructed that mere delay in the prosecution of this case, standing alone, is not to be considered by you in arriving at your verdict."

We conceive this instruction to be correct. The function of the trial judge is to charge the legal principles which shall govern the jury in making its determination. In the eyes of the law, delay in prosecution, considered in and of itself, is not a factor pertinent to evaluating guilt or innocence. It had no independent logical relevance to the issue of whether O'Leary had murdered Szabo.

The jury was not foreclosed by this instruction from properly taking into account the possible effect of the lapse of so many years upon the recollection of the State's witnesses and upon similar matters of credibility. The jurors were well aware of the delay which had followed the return of the present indictment which of itself clearly indicated its age and was available for their perusal and consideration in the jury room.

It is alleged error was committed in the admission of the written dying declaration. The objection centers around the fact that it was marked with an "X" by the decedent while his hand was held by Captain Monks, plus the fact that documentary evidence carries much more weight with the jury than a witness' oral testimony.

The general rule in this State is that both oral and written dying declarations are admissible in evidence. A statement given under the influence of a certainty of imminent dissolution may be recorded and, if signed by the decedent, offered as his dying declaration. See, e. g., State v. Bricker, 98 N. J. L. 58 (Sup. Ct. 1922), affirmed 99 N. J. L. 520 (E. & A. 1924); State v. Biango, 75 N. J. L. 284 (Sup. Ct. 1907), affirmed 79 N. J. L. 523 (E. & A. 1909).

The proof here is more than adequate to establish that Szabo was in the required state of mind concerning his demise. The statement was signed with an "X" and Szabo's hand was guided by the police officer because of the serious injuries sustained by the declarant, who had been paralyzed from the "nipple line" on down.

With respect to the contention that a document is more impressive to a jury than oral testimony, some of our

decisions have so indicated. *State v. Cleveland,* 6 *N. J.* 316 (1951); *Springer v. Labow,* 108 *N. J. L.* 68 (*Sup. Ct.* 1931). But this does not mean that all documentary evidence therefore becomes inadmissible. The jury in this instance, at the defendant's request, was charged:

"\* \* \* However, this [written dying declaration] should not receive any greater weight by the jury than if the same was oral testimony."

This cautionary instruction, sought by the appellant, was all he was entitled to under the circumstances.

The three remaining arguments urged upon us as grounds for reversal all relate to the identification by Szabo of the photograph of O'Leary, its admission into evidence, and the effect of the court's eradicating certain notations thereon.

The appellant contends that Detective McCann should not have been permitted to relate to the jury that he had gone to the hospital early on the morning of May 3, 1929 to show a picture of O'Leary to Szabo, who said: "That's Cockeye O'Leary and he's one of the four men that shot me."

This narration of decedent's words by McCann was, of course, hearsay. Nevertheless, it was admissible as the contents of a dying declaration. O'Leary's objection seems to be that there could be but one dying declaration, and that when the written statement of Szabo was completed and signed after interrogation by Captain Monks and Detective Potosnak, it could not thereafter be supplemented by showing a photograph of O'Leary to the victim, who then identified the appellant as his assailant. The appellant theorizes that the written dying declaration was complete and hence no further or other declaration could be introduced, even though Szabo was *in extremis* and his dissolution was imminent.

There is no rule signifying that there may be but one dying declaration. Even though they be separate and apart, dying declarations are admissible as long as the decedent remains under the impression that death will speedily ensue. The fact that there was a written dying

declaration does not of itself nullify a later oral dying declaration if the prerequisites for the admission of that kind of statement are proven. The rules of integration and merger do not apply in this area. There may be successive oral and written declarations in any order. 5 *Wigmore, Evidence* (3*d ed.* 1940), § 1450.

The photograph of the appellant identified by Szabo had been taken from the Rogues' Gallery and contained a caption on the back revealing a prior criminal involvement for robbery. The trial court, recognizing the hearsay character of such caption and its highly prejudicial effect, *State v. Rombolo,* 89 *N. J. L.* 565 (*E. & A.* 1916), allowed the admission of the photograph as evidence only after the legend had been expunged.

This constitutes the gist of the complaint, the appellant, as at the trial, maintaining the photograph should have been excluded entirely or that, in the alternative, it should have gone into evidence without the concealment of the caption.

Admittedly, the writing on the back of the photograph was hearsay and its submission to the jury would have constituted error. Thus, the appellant's anomalous primary effort was to induce the court below to commit reversible error so that the judgment of conviction, if it ensued, could be set aside. This novel contention is wholly without merit, and the action of the trial court in expunging the legend and protecting the appellant against the use of highly prejudicial and unwarranted hearsay evidence is to be commended rather than criticized.

Finally, it is said there was error in the refusal of the trial judge to grant a mistrial after Lieutenant Jones of the Jersey City Police Department had testified the photograph in question came from "our gallery."

Appellant's attorney, on his cross-examination of Detective McCann, had been the first to explore the origins of the photograph, but when this remark was made he promptly objected and moved for a mistrial, claiming it was highly prejudicial. Although the motion was denied, the trial judge struck the testimony from the record, saying it was

obvious that the testifying officer was not positive the photograph had come from any particular place.

The granting of a motion for a mistrial in a criminal case is in the sound discretion of the court, and its denial will not be reversed unless there is a clear showing of harm to the defendant or an abuse of discretion. *State v. Witte,* 13 *N. J.* 598 (1953).

There are some unusual aspects to this case, but a meticulous examination of the full record reveals nothing to indicate the appellant suffered manifest wrong or injury requiring a reversal.

The judgment of conviction is affirmed.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice WACHENFELD but feel it ought to be expressly noted that no view should be inferred therefrom with respect to an issue not raised before us. The trial court charged that in the circumstances therein stated defendant's "failure to testify with relation to those facts *raises a strong presumption* that he could not truthfully deny those facts." (Emphasis added) Defendant did not raise the question whether the instruction should be that the failure to testify will *permit* the jury to draw an *inference* that the defendant could not truthfully deny the facts. Both expressions find support in decisions in this state and sometimes in the same opinion. See *Parker v. State,* 61 *N. J. L.* 308 (*Sup. Ct.* 1898), affirmed 62 *N. J. L.* 801 (*E. & A.* 1899); *State v. Wines,* 65 *N. J. L.* 31 (*Sup. Ct.* 1900); *State v. Twining,* 73 *N. J. L.* 3 (*Sup. Ct.* 1905), affirmed 73 *N. J. L.* 683 (*E. & A.* 1906), affirmed 211 *U. S.* 78, 29 *S. Ct.* 14, 53 *L. Ed.* 97 (1908); *State v. Banusik,* 84 *N. J. L.* 640 (*E. & A.* 1906); *State v. Skillman,* 76 *N. J. L.* 464 (*Sup. Ct.* 1908), affirmed 77 *N. J. L.* 804 (*E. & A.* 1909); *State v. Callahan,* 77 *N. J. L.* 685 (*E. & A.* 1909); *State v. DiBenedetto,* 82 *N. J. L.* 168 (*Sup. Ct.* 1912), affirmed 83 *N. J. L.* 792 (*E. & A.* 1912); *State v. Howard,* 83 *N. J. L.* 636 (*E. & A.* 1912); *State v. Schlosser,* 85 *N. J. L.* 165 (*Sup. Ct.* 1914), affirmed 86 *N. J. L.* 374 (*E. & A.*

1914); *State v. Schilling,* 95 *N. J. L.* 145 (*E. & A.* 1920); *State v. Kisik,* 99 *N. J. L.* 385 (*E. & A.* 1924); *State v. Rubenstein,* 5 *N. J. Misc.* 387 (*Sup. Ct.* 1927); *State v. Boccadoro,* 105 *N. J. L.* 352 (*E. & A.* 1929); *State v. Lennon,* 107 *N. J. L.* 94 (*E. & A.* 1930); *State v. Gimbel,* 107 *N. J. L.* 235 (*E. & A.* 1930); *State v. Lang,* 108 *N. J. L.* 98 (*E. & A.* 1931); *State v. Sgro,* 108 *N. J. L.* 528 (*E. & A.* 1932); *State v. Jefferson,* 131 *N. J. L.* 70 (*E. & A.* 1943); *State v. Friedman,* 135 *N. J. L.* 414 (*Sup. Ct.* 1947), reversed 136 *N. J. L.* 527 (*E. & A.* 1948); *State v. Anderson,* 137 *N. J. L.* 6 (*Sup. Ct.* 1948); *State v. Gawronski,* 9 *N. J. Super.* 51 (*App. Div.* 1950); *State v. Ellrich,* 10 *N. J.* 146 (1952); *State v. Carbone,* 17 *N. J. Super.* 446 (*App. Div.* 1952), affirmed 10 *N. J.* 329 (1952); *State v. Edelman,* 19 *N. J. Super.* 350 (*App. Div.* 1952); *State v. Wilson,* 23 *N. J. Super.* 539 (*App. Div.* 1952); *State v. Marinella,* 24 *N. J. Super.* 49 (*App. Div.* 1952), certification denied 11 *N. J.* 612 (1953); *State v. Christy,* 26 *N. J. Super.* 459 (*App. Div.* 1953); *State v. Edelman,* 26 *N. J. Super.* 588 (*App. Div.* 1953); *State v. Costa,* 11 *N. J.* 239 (1953); *State v. Greely,* 11 *N. J.* 485 (1953); *State v. Wise,* 19 *N. J.* 59 (1955); *State v. Rogers,* 19 *N. J.* 218 (1955); *State v. DeMeo,* 35 *N. J. Super.* 168 (*App. Div.* 1955), certification denied 19 *N. J.* 330 (1955); *State v. Cerce,* 22 *N. J.* 236 (1956): and compare with respect to flight, *State v. Petrolia,* 45 *N. J. Super.* 230 (*App. Div.* 1957), certification denied 25 *N. J.* 43 (September 16, 1957).

WEINTRAUB, C. J., and HEHER, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and FRANCIS—7.

*For reversal*—None.