STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JOHN B. CRONIN, DEFENDANT-APPELLANT, AND
FRANK E. RENNER, *ET AL.*, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued January 18, 1965—Decided February 3, 1965.

Before Judges GOLDMANN, SULLIVAN and LABRECQUE.

*Mr. Max Mehler* argued the cause for appellant.

*Mr. Donald H. Mintz* argued the cause for respondent (*Mr. Brendan T. Byrne,* County Prosecutor, attorney; *Mr. Peter Murray,* Assistant County Prosecutor, on the brief).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. John B. Cronin appeals from judgments of conviction on four indictments which were consolidated for trial. Frank E. Renner, a co-defendant in three of the indictments, and Industrial Hardware, Inc. (Hardware), a co-defendant in a fourth indictment, do not appeal their convictions. Paul E. Vance, a co-defendant in three of the indictments, was not tried; he had pleaded guilty to two of them prior to trial and testified for the State after his case on the remaining indictment was severed. Cronin seeks reversal on three grounds, alleging that the trial court committed error in (1) denying his request for a copy of Vance's grand jury testimony, (2) consolidating for trial all four indictments, and (3) refusing to acquit him of the offenses charged in indictments Nos. 649 and 650.

## I.

Indictment No. 649 charges that on October 5, 1957 Renner, while an officer of Hardware, made false entries in four certain sales invoices of Hardware with intent to defraud Daniel J. Cronin, Inc. (hereinafter DJ), Standard Accident Insurance Company (Standard), and Union County Trust Company (Bank), in violation of *N. J. S.* 2A :111–9, and that Cronin and Vance aided, abetted, procured and willfully caused Renner to commit the offense, in violation of *N. J. S.* 2A :85–14 and 2A :111–9.

Indictment No. 650 is in ten counts, each of which, like No. 649, charges Renner with making false entries in certain invoices of Hardware on specific dates (between May 2 and August 26, 1957) with intent to defraud DJ, Standard and Bank, and that Cronin aided, abetted, procured and willfully caused Renner to commit the offenses, all in violation of the statutes mentioned in No. 649.

Indictment No. 651 is in two counts. The first charged that on May 8, 1957 Vance and Cronin knowingly and designedly represented and pretended to the Board of Trustees

of the Newark College of Engineering (Engineering) that R. A. Kendall Company (Kendall) was a subcontractor or materialman of DJ, which held a general contract for the construction of a building for Engineering and was entitled to receive $7,435 out of monies then owed by Engineering to DJ, whereas Vance and Cronin knew that Kendall was not a subcontractor or materialman of DJ but a fictitious firm not entitled to receive any monies; and that by means of such false pretenses (Engineering relying upon the truth thereof and being deceived thereby) they unlawfully obtained $7,435 from Engineering with intent to cheat and defraud, in violation of *N. J. S.* 2A:111–1. The second count is identical with the first, except that Vance and Cronin were charged with having obtained $11,385 from Engineering on June 13, 1957 through the use of another fictitious subcontractor or materialman, Edward C. O'Brien (O'Brien).

Indictment No. 648, in one count, charged Cronin, Renner, Hardware and Vance with conspiracy. It alleged that Cronin was an officer of DJ between July 1, 1955 and August 30, 1959; that Vance was employed by DJ from October 25, 1956 to September 29, 1958; that Renner was an officer of Hardware and two other named companies; that as of January 26, 1956 DJ held construction contracts with the Board of Education of Garfield, N. J., for a new high school building, with the Essex County Board of Freeholders for a building at Overbrook Hospital, and with the Board of Trustees of the Essex County Parental School (Parental School) for an addition and alterations to the Essex Youth House, upon which contracts, as well as others of DJ, Standard had issued performance bonds; and that DJ assigned those contracts to Bank as collateral security for the repayment of loans it had made to DJ. The indictment further alleged that DJ thereafter obtained construction contracts from the Board of Education of East Paterson, N. J. (East Paterson) for a new high school, from Engineering for a building, and from Our Lady of Sorrows Church for the construction of an addition to the church school, and that Standard issued performance

bonds on the East Paterson and Engineering contracts, but not on the church contract. Further, that having obtained these three contracts, DJ applied to Bank for a loan of $300,000, which would be in addition to its existing indebtedness to Bank of $703,000; that following negotiations, DJ, Standard and Bank entered into an agreement on July 19, 1956 which provided for an additional credit by Bank to DJ in the form of a revolving fund up to $375,000, with Standard guaranteeing repayment, the additional funds being for the purpose of assisting DJ in completing its pending building contracts; and that under this agreement funds could be drawn upon Bank alone for the payment of DJ's obligations arising out of the construction contracts on which Standard had issued performance bonds. DJ agreed to deposit in a special account with Bank all proceeds received from property owners from whom it held construction contracts secured by Standard, and DJ further agreed to assign any profits resulting from the construction of the church building not bonded by Standard. The funds so deposited were to be used in the first instance to pay DJ's obligations arising under the contracts guaranteed by Standard.

Indictment No. 648 then charged as follows:

1. Between July 1, 1955 and November 30, 1959 Cronin, Renner, Hardware and Vance conspired to cheat and defraud DJ, Standard and Bank by means of Renner, for himself and on behalf of Hardware, making and presenting to DJ for payment false and fraudulent sales invoices which included material, supplies, tools and equipment not sold or delivered to DJ at its construction sites or its yard, and by means of Cronin and Vance causing these invoices to be paid by DJ, Standard and Bank, with the intent on the part of the four defendants to defraud DJ, Standard and Bank.

2. The four defendants further conspired, with intent to cheat and defraud, to obtain money from DJ, Engineering, East Paterson and Parental School by falsely representing to them that Hardware, as a materialman of DJ, was entitled to payment out of monies owed by Engineering, East Paterson and Parental School to DJ for labor and materials in connection with the construction of their respective buildings, knowing that Hardware was not so entitled, or was entitled to lesser sums.

3. Cronin and Vance, with intent to cheat and defraud, conspired to obtain money from Engineering and East Paterson by falsely

representing to them and DJ that O'Brien and Kendall were sub-
contractors of DJ and therefore entitled to receive monies owed by
Engineering and East Paterson to DJ for labor and materials in
connection with their construction contracts; whereas Cronin and
Vance knew that O'Brien and Kendall were fictitious and not entitled
to any monies from Engineering and East Paterson.

The indictment then sets forth 15 overt acts allegedly per-
formed in execution of the conspiracy.

At the close of the State's case the prosecution withdrew
the fifth count of indictment No. 650, and it was dismissed.
The remaining charges were submitted to the jury, which
found Cronin, Hardware and Renner guilty of the respective
charges made against them.

Cronin was sentenced to pay fines of $1,000 on indictment
No. 648, $1,000 on the first count of No. 650, and $1,000 on
each of the two counts of No. 651—a total of $4,000. Imposi-
tion of sentence was suspended on No. 649, and on all the
remaining counts of No. 650. Concurrent penitentiary sen-
tences of six months each were also imposed on No. 648 and
the first count of No. 651, but were suspended.

## II.

■ Vance, who had pleaded guilty to two of the indict-
ments, was the State's principal witness against Cronin. We
have no doubt that his testimony weighed heavily against
Cronin on indictments Nos. 649 and 650, and those parts of
No. 648 involving the false sales invoices. And although there
was other testimony pointing to Cronin's guilt in connection
with the Kendall and O'Brien transactions referred to in
indictments Nos. 648 and 651, here, too, it was Vance's testi-
mony which gave the jury the detailed background of those
fictitious transactions.

Vance had testified before the grand jury, and his testi-
mony had been stenographically reported. Since he was a key
witness, his possible impeachment on the basis of what he had
said under oath before the grand jury was of obvious im-
portance to Cronin. Accordingly, at the conclusion of Vance's

direct testimony Cronin's attorney made application for a copy of Vance's grand jury testimony. Before acting on the motion, the trial judge inquired of Vance whether he had seen or used the transcript before testifying, and his answer was "no." There ensued a colloquy between the judge and the prosecuting attorney regarding *State v. DiModica*, 73 *N. J. Super*. 1 (*App. Div.* 1962), then on review before our Supreme Court but not yet decided. The judge proceeded to deny Cronin's motion on the basis of the Appellate Division's decision in that case, stating it had not been demonstrated that there was a particular need for the transcript, and there was no proof that Vance had used the transcript in preparing for his appearance as a witness at the trial. We hold this to have been reversible error.

In *State v. Mucci*, 25 *N. J.* 423 (1957), the court found prejudice and reversible error in the trial court's refusal to allow defendant to inspect and use on cross-examination the grand jury testimony of witnesses who had refreshed their recollection by reading and discussing that testimony before testifying at the trial. In *State v. Hunt*, 25 *N. J.* 514 (1958), a murder case, a detective testified as to conversations with defendant. He had made notes of those conversations and read them before appearing on the witness stand, but did not testify directly from them during the trial. The trial court's refusal to allow defense counsel to examine the notes and use them in cross-examination of the detective was held reversible error.

Defendant in *State v. Moffa*, 36 *N. J.* 219 (1961), affirming 64 *N. J. Super*. 69 (*Law Div.* 1960), was accused of suborning a witness to testify falsely before the grand jury. The trial judge granted his motion for pretrial inspection of the balance of that witness' testimony. The State obtained leave to appeal. Citing instances of reversals of convictions for refusal to make grand jury testimony available to a defendant, the Supreme Court pointed out that "it has long been our rule that proceedings before a grand jury may be disclosed if justice so requires." Justices Proctor and Hall dissented; in

their view, a defendant was not entitled to pretrial disclosure of testimony given by a witness before a grand jury. However, Justice Proctor went on to say that "When the reasons for cloaking grand jury testimony in secrecy have disappeared, the cloak should be lifted. As I have stated, such a disclosure of testimony might well be in order in the present case *at the trial* when need for secrecy may disappear." (Italics in the text) He referred to the dissent in *Pittsburgh Plate Glass Co. v. United States*, 360 *U. S.* 395, 79 *S. Ct.* 1237, 3 *L. Ed. 2d* 1323 (1959), and noted it only recognized that access to grand jury testimony should have been afforded defendant at the trial.

In *DiModica* the Appellate Division affirmed the trial court's denial of defendant's application for the grand jury testimony of an important witness, made at the conclusion of that witness' direct testimony. The court held that a defendant in a criminal trial does not have an absolute right to such testimony. There must be timely application and a showing of good cause, and the granting or denial of an application to inspect grand jury testimony was a matter lying within the sound discretion of the trial court. Reliance was placed upon the *Pittsburgh Plate Glass* case, above, the court holding that defendant had not demonstrated "a particularized need" for the testimony he requested. The "particularized need" test was precisely the ground relied on by the trial court in denying Cronin's application in this case.

On appeal (40 *N. J.* 404) our Supreme Court made it clear that it disagreed with our holding in *DiModica*. After granting defendant's petition for certification, the Supreme Court had directed the trial court to take testimony to determine whether a stenographic record of the testimony of the witnesses before the grand jury had in fact been made. On remand the inquiry disclosed that there had been no stenographer present at the grand jury proceedings, and hence no record existed. Accordingly, the Supreme Court held that the trial court's denial of defendant's application, even if erroneous, could not be considered harmful. Nonetheless, in view

of the position taken by the Appellate Division in affirming the trial court's ruling, the court went on to discuss the core question posed by *DiModica*, and one which lies at the heart of this case.

Some two months before deciding *DiModica*, the Supreme Court had handed down its decision in *State v. Clement*, 40 *N. J.* 139 (1963). The question there was whether defendants should be permitted pretrial inspection of their grand jury testimony after they had asserted that their recollection of that testimony was not complete or precise, and their counsel had certified that he could not prepare for trial with confidence unless he knew what his clients had said. The trial court had denied defendants' motions for inspection. The Supreme Court reversed. After referring to *R. R.* 3:3–7 ("The requirements as to secrecy of proceedings of the grand jury shall remain as heretofore"), Chief Justice Weintraub said:

"\* \* \* Secrecy of course impedes the search for truth and hence must rest firmly upon some greater social need. That the secrecy of the grand jury has never been absolute is clear enough. \* \* \*" (at *page* 142)

After examining the reasons for the rule, he stated that the court found no need for grand jury secrecy in the setting of *Clement*, and hence no good reason to deny defendants a fair opportunity to prepare for trial. *R. R.* 3:3–7, the only rule directly relevant, was held as not laying down the controlling principle, and therefore "the development of the concept case by case involves no departure from the content of the rule." (at *pages* 144–145)

Justice Proctor, who wrote for the Supreme Court in *DiModica*, said that none of the five reasons for grand jury secrecy mentioned in *Clement* stood in the way of permitting a defendant at trial to inspect the grand jury testimony of a witness who had already testified against him on direct examination. Noting that the Appellate Division had seemingly required that defendant show the trial court some basis for

believing there was a variance between the witness' testimony before the grand jury and his testimony at the trial, Justice Proctor said:

"* * * We cannot accept this requirement. A defendant is in no position to determine whether such a variance exists until he is afforded an opportunity to inspect the prior testimony. Requiring him first to show conflict between the grand jury testimony and the trial testimony of a State's witness, therefore, would effectively foreclose the defendant from using the grand jury testimony for purposes of cross-examination. * * *" (at *page* 411)

The State argues that *DiModica* should not control this case because it established a new rule of law which should only be applied prospectively. We do not agree. As we read that case, the Supreme Court was simply carrying forward its holdings in *Mucci, Hunt* and *Moffa,* and so very recently in *Clement.* It refused to follow the majority opinion in the *Pittsburgh Plate Glass* case, on which the Appellate Division had relied.

Looking at the matter in another light, we find it difficult not to permit Cronin to raise the same claim of error as was successfully projected by another defendant (DiModica) in a case pending in the Supreme Court at the very time Cronin asked the trial court for permission to look at Vance's grand jury testimony. As Chief Justice Weintraub has said ("Judicial Legislation," 81 *N. J. L. J.* 545, 549 (Oct. 30, 1958)), if a litigant who has helped to accomplish a change or an advance in the law is rewarded, "it is difficult to deny the same benefit to others whose controversies are not barred by the Statute of Limitations or by a judgment which is beyond appeal."

Our Supreme Court has not hesitated to apply retroactively *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1960), rehearing denied 368 *U. S.* 871, 82 *S. Ct.* 23, 7 *L. Ed. 2d* 72 (1961), where the United States Supreme Court completely overturned a rule of law which had existed for decades. See *State v. James S. Smith,* 37 *N. J.* 481, 483 *et seq.* (1962), *certiorari* denied 374 *U. S.* 835, 83 *S. Ct.* 1879, 10 *L. Ed. 2d*

1055 (1962) ; *State v. Scrotsky,* 38 *N. J.* 14 (1962) ; and *cf.*
*State v. Doyle,* 40 *N. J.* 320 (1963). And recently this court,
in *State v. Jacques,* 86 *N. J. Super.* 386 (1965), held that
*Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed. 2d*
653 (1964)—which overruled *Twining v. State of New Jer-*
*sey,* 211 *U. S.* 78, 29 *S. Ct.* 14, 53 *L. Ed.* 97 (1908), *Adam-*
*son v. People of State of California,* 332 *U. S.* 46, 67 *S. Ct.*
1672, 91 *L. Ed.* 1903, 171 *A. L. R.* 1223 (1947)—would be
given retroactive effect on a direct appeal from a conviction
obtained at about the time of the coming down of that deci-
sion. And see *State v. Murphy,* 85 *N. J. Super.* 391 (*App.*
*Div.* 1964).

The State also contends that the denial of a copy of Vance's
grand jury testimony did not prejudice Cronin because
Vance's trial testimony "was completely unnecessary in order
for the State to carry its burden," and (2) it "did not enter
into the jury determination of defendant's guilt—or, alterna-
tively, Vance's testimony would have been believed by the
jury, further impeachment notwithstanding." The first rea-
son has little to support it. We have already described Vance
as the State's principal witness, the man whose testimony
brought home to the jury the entire picture of the false entries
in the books of Hardware with intent to defraud, the false
pretenses involved in the fictitious Kendall and O'Brien situ-
ations, and the conspiracy. The fact is that the State did not
attempt to prove its case without Vance, but placed great
reliance upon him.

As for the second reason, we are asked to launch judicial
reason upon a sea of speculation. To say that Vance's testi-
mony did not enter into the jury's finding of guilt is not only
to engage in speculation but to disregard the realities of the
case. And to say that the jury would have believed Vance,
further impeachment notwithstanding, is to invite an exercise
in clairvoyance.

After the State had filed its answering brief, it applied to
us for an order permitting it to file Vance's grand jury testi-
mony as part of its appendix. We granted permission, but

ordered that the testimony should not presently be deemed part of the appendix, reserving to the parties the right to discuss the propriety of its use in our consideration of the appeal on the merits.

The State suggests that we compare Vance's testimony at the trial with what he told the grand jury. The Supreme Court in *State v. Sullivan,* 43 *N. J.* 209, 240 (1964), made such a comparison and, although it found some conflicts, deemed them not so material or prejudicial, in light of the whole case, as to justify a reversal. The State concedes that *Sullivan* is only obliquely related to this case. We find it completely distinguishable because of its factual and procedural setting.

Murder indictments had been returned against Sullivan, Aiken, Taylor and Garner. Sullivan and Aiken pleaded *non vult.* In the course of the trial of Taylor and Garner, and during the examination of Sullivan and Aiken, the trial judge directed the assistant prosecutor to turn over to defense counsel for use on cross-examination "any notes or statements [of the witness] covering the subject matter of his direct testimony." He complied. After the four defendants had been sentenced, Sullivan and Aiken recanted their trial testimony and disavowed their confessions. Garner and Taylor then moved for a new trial on the ground of newly discovered evidence. At the hearing on the motion their counsel learned for the first time that Sullivan and Aiken had testified before the grand jury in connection with the involvement of a fifth person in the crime. (At the original trial no one had thought about such testimony or deemed it included in the court's order to turn over the statements of witnesses. The Supreme Court observed that there was no reasonable basis for suggesting that the prosecuting attorney had not acted in good faith.) Armed with this information, defense counsel asked for a copy of the grand jury testimony. The trial court denied the application.

When *Sullivan* was argued before the Supreme Court, it directed the State to deliver transcripts of the grand jury

testimony to counsel and the court for examination. Thereafter counsel, by letter, asserted there were inconsistencies between the trial and grand jury testimony of Sullivan and Aiken, contending that these inconsistencies were sufficiently grave to require a reversal. The grand jury testimony could then be used in attacking Sullivan's and Aiken's credibility at a new trial. The court, as stated, found some conflicts of an immaterial and nonprejudicial nature. It did not discuss the law of the case, but it would appear that the court considered the matter under the plain error rule, *R. R.* 1:5–1(a). It is well established that an appellate court will not reverse a conviction for plain error unless the claimed legal impropriety affected defendant's substantial rights and was "sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Corby*, 28 *N. J.* 106, 108 (1958); *cf. State v. Driver*, 38 *N. J.* 255 (1962).

*Sullivan* is also understandable if viewed in the light of the newly discovered evidence rule, for a new trial will not be granted if the evidence is merely impeaching or contradictory. *State v. Edgar Smith*, 29 *N. J.* 561, 573 (1959).

The *Sullivan* court reaffirmed its holding in *State v. DiModica*, above, when it stated that "Under ordinary circumstances, if counsel knew of the [grand jury] testimony and demanded it, or if the prosecutor was aware of it, defendants were entitled to have it for purposes of cross-examination. (43 *N. J.*, at *page* 240)

Here, the existence of Vance's grand jury testimony was known, and its production demanded and denied. We perceive no warrant for our now comparing what Vance said on the witness stand and what he told the grand jury. We may not "second-guess" the possible use defense counsel might have made of the grand jury testimony when cross-examining Vance. We should not speculate whether that testimony could have been effectively utilized.

In *Rosenberg v. United States*, 360 *U. S.* 367, 79 *S. Ct.* 1231, 3 *L. Ed.* 2d 1304 (1959), the issue was the trial court's

refusal to direct the Government to turn over to defendant a letter written by the victim of a fraud. The Court of Appeals found that the failure to produce the letter was of no consequence since the information contained therein was already in the possession of the defense by way of admissions made by the victim while testifying. Five justices considered that they were precluded from rejecting the judgment of the Court of Appeals in holding the error not harmful in the circumstances. (But *cf.* what the court later said in *Clancy v. United States,* 365 *U. S.* 312, 316, 81 *S. Ct.* 645, 648, 5 *L. Ed.* 2d 574, 577 (1961)).

Despite this ruling the majority cautioned that "an appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled." Justice Brennan, speaking for the four dissenting justices, noted that defense counsel, if armed with the letter, might well have probed more deeply than he did in testing how the witness' memory of the events to which she testified was refreshed. He said:

"The principle underlying our decision in *Jencks v. United States,* 353 *U. S.* 657, 77 *S. Ct.* 1007, 1 *L. Ed.* 2d 1103, was that it is impossible for a judge to be fully aware of all the possibilities for impeachment inhering in a prior statement of a government witness, 'Because only the defense is adequately equipped to determine [its] * * * effective use for purpose of discrediting the Government's witness and thereby furthering the accused's defense * * *.' 353 *U. S.*, at 668–669, 77 *S. Ct.* 1007.

The *Jencks* statute was clearly designed to effectuate this principle. The statute, while delimiting the statements which are to be turned over to the defense, obviously comprehends that statements which are producible under it must be given to the defense regardless of a judge's opinion as to how useful they might be on cross-examination, for only the defense can fully appreciate their possible utility for impeachment. This is the rationale of the *Jencks* case, and this is the rationale of the statute. * * * [F]idelity to the principle underlying *Jencks* and the *Jencks* statute requires, I think, that when the defense has been denied a statement producible under the statute, an appellate court should order a new trial unless the circumstances justify the conclusion that a finding that such a denial was harmful error would be clearly erroneous. In that determination, appellate courts should be hesitant to take it upon themselves to decide that the defense could

not have effectively utilized a producible statement. This must necessarily be the case if the appellate court is to give effect to the underlying principle of *Jencks*, affirmed by the statute, which, I repeat, is that 'only the defense is adequately equipped to determine [its] * * * effective use for purpose of discrediting the Government's witness * * *.' " (360 *U. S.*, at *pages* 374–376, 79 *S. Ct.*, at *page* 1236, 3 *L. Ed. 2d*, at *pages* 1309–1310)

Justice Brennan concluded that "it was error for the Court of Appeals to second-guess defense counsel as to the possible use of the letter on cross-examination."

And in *Clancy*, above, the court, relying on the *Jencks* case, reversed the conviction for failure to produce Government memoranda, and said

"* * * Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively. * * *" (365 *U. S.*, at *page* 316, 81 *S. Ct.*, at *page* 648, 5 *L. Ed. 2d*, at *page* 577)

Justice Jacobs, speaking for the court in *State v. Hunt*, above, 25 *N. J.*, at *page* 530, said that, armed with a witness' prior statement defense counsel "might have found significant omissions, different interpretations, or even affirmative inconsistencies, which when pursued, might have brought about a truer and more accurate portrayal before the jury. In such event, the interests of justice would have been considerably advanced."

Possessed of the grand jury testimony, defense counsel might well have affected Vance's credibility by showing the true measure of his bias toward Cronin, or a revenge motive—matters which defense counsel says emerge from Vance's grand jury testimony. He avers that he could also have used that record to show that damaging testimony given by Vance on the stand had not been given before the grand jury. Defense counsel was entitled to do so.

We hold that the denial of Cronin's application for the grand jury minutes requires a new trial.

## III.

Defendant's second contention is that the trial court erred in consolidating all four indictments for trial. He points to the fact that Renner and Hardware were in no way involved in, nor did they know of, the Kendall and O'Brien transactions, the subject matter of indictment No. 651 and part of No. 648. The State freely conceded at the trial that this was so.

Prior to trial the State moved to consolidate the conspiracy indictment (No. 648) with the other three. The motion was granted over objection. Thereafter, and a few days before the trial, defendants unsuccessfully moved that indictment No. 651, dealing with the Kendall and O'Brien transactions, not be tried with the other indictments because such joinder would prejudice them. Then, on the day of the trial and before the jury was drawn, they renewed their motion (again without success) to sever No. 651, and at the same time moved to strike from No. 648 (the conspiracy indictment) that portion which related to the Kendall and O'Brien transactions, urging that those transactions, if proved, would show a different and separate conspiracy. Finally, at the conclusion of the State's case, Cronin's counsel moved to strike all the testimony relating to Kendall and O'Brien and for a mistrial on the ground that this evidence was so prejudicial that it could not be erased from the jurors' minds. The motions were denied.

Defendant takes the position that as a matter of law the trial court had no discretion to permit a consolidated trial of all the charges and, further, that even if it had such power, it abused its discretion in ordering consolidation. We deal with the matter in light of the fact that a new trial must be held.

Whatever might have been the situation prior to and at the trial below, the present status of the case is entirely different. Originally there were four defendants—Cronin, Renner, Hardware and Vance. Only the first three stood trial, Vance

having pleaded guilty to two of the indictments. Renner and Hardware have not appealed their convictions. Only Cronin will be retried.

The testimony below deeply involved Cronin, as reflected in the verdict finding him guilty on all charges. At the new trial the State will undoubtedly proceed to show once again that Cronin aided, abetted, procured and willfully caused Renner to commit the offense charged in indictments Nos. 649 and 650; that he and Vance were the architects of the Kendall and O'Brien schemes (No. 651), and that he was part and parcel of the conspiracy detailed in No. 648. And the new trial will again center on the siphoning off of the $375,-000 revolving fund, the subject of the agreement entered into by DJ, Standard and Bank on July 19, 1956. All this being so, we fail to see how consolidation of the four indictments will prejudice Cronin as he stands retrial alone.

## IV.

Defendant's final argument is addressed to the trial court's refusal to acquit him of the offenses charged in indictments Nos. 649 and 650 wherein it was charged that Renner, as an officer of Hardware, made false entries in various Hardware invoices with intent to defraud DJ, Standard and Bank, in violation of *N. J. S.* 2A:111–9, and that Cronin (in both indictments) and Vance (in No. 649) aided Renner in the commission of the offenses, contrary to that statute.

The motion for acquittal on these charges came at the close of the State's case. Defense counsel argued then, as he does now, that the statute under which the indictments were drawn was designed to protect a corporation or other employing entity against a dishonest or faithless servant who makes false entries in his employer's books, papers and records for the purpose and with the intention of defrauding him. Since there was no proof that the allegedly false Hardware invoices were made with the intention of defrauding Hardware, no violation by Renner of the statute had been shown. Therefore,

said defense counsel, Cronin could not be found guilty of aiding and abetting.

*N. J. S.* 2A:111–9 provides:

"Any director, officer, manager, employee, agent or member of a corporation, partnership or association who, with intent to defraud, destroys, alters, mutilates or falsifies any book, paper, writing or valuable security belonging to it, or makes or concurs in the making of any false entry, or omits or concurs in omitting any material particular in any book of accounts or other document belonging thereto, is guilty of a misdemeanor."

We have been referred to no case construing this statute, even though it has been part of our New Jersey laws since at least as early as 1898. *L.* 1898, *c.* 235, § 174.

Defendant argues that it is "plain" that the words "with intent to defraud" in *N. J. S.* 2A:111–9 were inserted by the Legislature "to make certain that the purpose of the statute was not to condemn innocent acts of an employing entity's agent or servant but to condemn acts which are committed intentionally and for the purpose of defrauding the entity." It is contended that neither the statute, nor any that counsel has been able to find, proscribes the falsification of one's own records for the purpose of defrauding another.

*N. J. S.* 2A:111–9 makes no such particularization. As the State properly points out, fraud perpetrated through the manipulation of company records is a specific type of fraud. (Manipulation of an individual's personal records with intent to defraud would seem to be proscribed by the more general false pretense section, *N. J. S.* 2A:111–1.) Accordingly, the offense defined in *N. J. S.* 2A:111–9 would be one which logically includes *all* frauds perpetrated in the manner indicated, and this whether the resultant harm falls on the company or another, or both.

We consider defendant's interpretation of the statute a strained one. In our opinion, *N. J. S.* 2A:111–9 includes the very situation here involved. Renner is alleged to have falsified invoices while an officer of Hardware—this, in the words of the two indictments, Nos. 649 and 650, and the statute,

"with intent to defraud." The victims of the alleged fraud were DJ, Standard and Bank. We therefore hold that the trial court properly denied the motion to acquit.

Reversed and remanded for a new trial as to Cronin.